COMMISSIONER OF INTERNAL REVENUE v. GREENSPUN.

GREENSPUN v. COMMISSIONER OF INTERNAL REVENUE.

PARKER–BROWNE CO. v. SAME.
No. 11322.

Circuit Court of Appeals, Fifth Circuit.
July 19, 1946.

As Modified on Denial of Rehearing
Aug. 22, 1946.

918

Douglas W. McGregor, Asst. Atty. Gen., Melva M. Graney, Sewall Key, J. Louis Monarch, and L. W. Post, Sp. Assts. to Atty. Gen., and J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and John W. Smith, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for Commissioner of Internal Revenue.

Wm. A. Blakley and Hoyet A. Armstrong, both of Dallas, Tex., for the taxpayers.

Before SIBLEY, HUTCHESON, and WALLER, Circuit Judges.

HUTCHESON, Circuit Judge.

These three appeals, one by the commissioner and one by each taxpayer, involve income taxes of M. Greenspun and excess profits and surtaxes of Parker-Browne Company, his solely owned corporation, for the years 1938, 1939 and 1940. They present four questions for our decision. Coming up on a record which tells a tale of family trusts and family corporations, and of Greenspun as the genius evoking and dominating them all, their proper answer requires not only a recognition of these facts but a thorough understanding and correct appraisal of the weight they should be given in the scales of decision.

The commissioner, in respect of the question he brings up, the taxability to Greenspun of the income of two trusts, complains that the Tax Court has ascribed too little weight, given too little effect, to the completely family nature of the trusts, too little to Greenspun's over all dominance.

Parker-Browne, as to the question it brings up, the disallowance as business expenses of the cylinder rents and royalties it paid to Greenspun Trust No. 1, and Greenspun, as to taxing them to him as informal dividends, complain that Greenspun's dominance of the corporation has bulked too large with the Tax Court, has weighed too heavily in its scales.

The third question, the disallowance to Greenspun of certain bad debt deductions does not involve these relationships, this dominance, and as to it there is no complaint that they bulked either too large or too small. The complaint as to it is that the disallowance was based not on a correct apprehension of, and correct findings as to, the facts but on a complete misapprehension, indeed an entire disregard, of the undisputed facts which control its decision.

The Tax Court, in a lengthy memorandum opinion, not reported, involving many questions other than those brought to us, has made a full and elaborate fact statement, of which, except as to the bad debt deduction, no complaint is made.

All of the facts are undisputed. It will not be necessary to elaborate them here. It will be sufficient to state our views as to the questions posed with such brief statement in the margin of the controlling facts [1] as will suffice to make the grounds of our decision clear.

---

[1] (1) Morris Greenspun is the dominating figure in all of the activities under review.

(2) The record presents no disputed issue of fact.

(3) Parker-Browne Company, a Texas corporation, was organized in 1905 and continued to do business until Dec. 27, 1941, when it was dissolved.

(4) In 1910, Greenspun acquired some stock in the company and in 1917 or 1918 became, and until its dissolution continued to be, its sole stockholder.

(5) Beginning about 1911 and continuing through the taxable years, the company was engaged in the manufacture for sale of carbonic acid gas which it distributed to its customers in steel cylinders or drums.

(6) Prior to 1917, the cylinders were owned by Greenspun and others who leased them to petitioner on the basis of a rental of 3¢ per pound of gas sold.

(7) About 1918, Greenspun acquired the interest of the other parties in the cylinder system and sold the cylinders to petitioner, Parker-Browne Co.

(8) In May, 1919, after he had become the sole stockholder, Greenspun bought them back at the same price and leased them to the corporation upon a royalty or rental basis of 3¢ per pound on all gas sold or delivered in the drums, the same royalty which Parker-Browne had been paying from 1911 to 1918, when it bought and for one year owned the cylinders.

(9) Continuously from July 1, 1919, Parker-Browne has paid rentals under

Petitioner, Parker-Browne, insists that in disallowing the sums claimed as rental or royalty expense and as expenses of replacing lost cylinders on the ground that

the terms of the applicable lease agreement existing from time to time.

(10) In addition to the cylinders sold by Greenspun to Parker-Browne in 1918 and back by Parker-Browne in 1919, for $56,698.00, Greenspun and Greenspun Trust No. 1 purchased additional cylinders in the amount of $107,098.99, all of which from the time of their acquisition were rented to Parker-Browne under the same terms as controlled the rental of the first lot.

(11) On May 27, 1931, the Greenspun trusts entered the picture. Greenspun and his wife created Greenspun Trust No. 1 by executing a trust indenture conveying to Brightwell, as Trustee for their three children, all of their rights and interests in and to the gas cylinders then owned by them and used by the Parker-Browne Company together with all rentals and moneys accruing under such contracts from and after January 1, 1930. On the same day they executed a trust agreement creating a residuary trust to receive for the ultimate benefit of these same children the net rentals paid to Greenspun Trust No. 1.

(12) On November 8, 1935, one of the children having died, Greenspun and his wife executed an instrument declaring it was their intention to revise Greenspun Trust No. 1, and on the same day they executed two separate trust instruments, one as to each of their two children.

(13) On Jan. 10, 1935, Brightwell, as Trustee of the Greenspun Trust No. 1, and Parker-Browne Co., by Greenspun, President, executed an instrument called lease and royalty agreement. This specified the method for computing the rentals, which, so far as important to our decision, we set out in full:

"Second party agrees to continue to pay as rental for such steel gas drums on the basis of a minimum of one cent (1¢) per pound to a maximum of three cents (3¢) per pound on all gas sold and delivered in such drums by second party. In computing the amount to be paid, second party may in the discretion of its manager, determine such amount on the basis of the income and/or profits from the sale of such gas, observing, however, the one cent (1¢) per pound minimum, and in no event to exceed the maximum of three cents (3¢) per pound on all gas sold and delivered in such drums."

It is further provided that Parker-Browne should continue to replace or pay the market value of all steel drums lost or misplaced.

(14) In the taxable years 1938, 1939 and 1940, petitioner paid or credited to Greenspun Trust No. 1, large sums as rentals or royalties; in 1938, $45,960.40; in 1939, $58,281.80; in 1940, $71,306.85. These amounts together with the expenses of replacing lost cylinders were claimed by petitioner, Parker-Browne, as expense deductions, were disallowed by respondent, and the disallowances were affirmed in the Tax Court.

(15) As to the trusts, the undisputed facts show, and the Tax Court found, that the trusts absolutely vested each of the beneficiaries with one-half interest in the property, subject only to the limitations imposed in the trust instrument. The trusts were of long duration. When they terminated all of the estate conveyed for the benefit of each was to be turned over to her. In the event of death of the beneficiaries, their interests were to pass or be inherited according to the will or the laws of descent and distribution. The trustee was given specific authority to invest and handle the funds and property of the estate. Under no conditions were the grantors to receive back or acquire any interest in the property of the trusts. Outside of the right reserved in the grantors to remove the trustee for any reason deemed advisable to them for the best interests of the beneficiaries and to appoint a substitute trustee, the grantors reserved no other right or power over the trustee.

The loans of the trust funds were in the main either to Parker-Browne Co., to Greenspun, or to the customers of Parker-Browne Co. Some of the borrowers paid 5 or 6 percent interest on such loans, while Greenspun paid 4% interest. In making loans to the customers of Parker-Browne, the trustee expected that company to profit therefrom through increased volume of business with the consequent larger income to the trust from cylinder rentals. Had the trustee failed or refused to administer the trust in a manner approved by Greenspun, the latter could have promptly removed him and made himself or some other person trustee, and thus the trustee could have been deprived at the will of Greenspun of a lucrative employment. The record shows that Greenspun was an astute and successful business man, that he dominated and gave directions to all activities involving his and his family's business and financial affairs, and in selecting a trustee, Greenspun chose a trusted employee of proven subservience to his will and wish.

their transfer in 1919 to Greenspun was not a bona fide transfer and that the company still owned them, the Tax Court refused to give effect to undisputed facts by invoking a principle of law sound enough in itself but inapplicable here.

Greenspun, on his appeal, claims that in the same way, and for the same reasons, the Tax Court erred in charging to him as informal dividends the amounts paid by Parker-Browne to Greenspun Trust No. 1 as rents and royalties. Contending, as Parker-Browne does, that these payments were properly made for rents and royalties and, therefore, proper deductions, Greenspun insists that they could not possibly be regarded as dividends to him paid at his request to his childrens' trusts. Thus the questions posed by Greenspun and Parker-Browne are in effect the same, and the answer to them depends upon whether or not the Tax Court was right in holding that not Greenspun, at first, and Greenspun Trust No. 1, later, but Parker-Browne, at all times after 1918, was the owner of the cylinders and the so-called rents and royalties were merely dividends paid.

In disposing adversely of the commissioner's claim, the Tax Court carefully examined and correctly rejected his contention that the income of the Greenspun trusts should, under Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788, be taxed to Greenspun because "the grantor retained so many of the attributes of ownership as to justify the conclusion that he continued to be the owner of the trust property within the meaning of Section 22 (a) Revenue Act 1938 [26 U.S.C.A. Int. Rev.Acts, page 1008]." Setting out fully and completely the facts relied on by the commissioner, Greenspun's astuteness, decisiveness and general attitude and position of authority and dominance, the Tax Court correctly concluded:

"But however that may be the fact remains that M. and Rose Greenspun created two irrevocable trusts without reversion for their children and conveyed thereto the sums of money representing the cylinder rentals. While the funds of the trusts were employed largely in loans that tended to promote the interests and enterprises of Greenspun, the loans were safe and profitable business transactions for the trusts. Both the corpus and the increment thereof belong indefeasibly to the beneficiaries. In creating and establishing the trusts the grantors parted with full title to and all economic interest and benefit in the funds thereof. We hold, therefore, that the trusts were valid and bona fide and that the income thereof is not taxable to M. and Rose Greenspun either under section 22(a) as applied in Helvering v. Clifford, supra, or at all. Jones v. Norris, 10 Cir., 122 F. 2d 6."

We agree with and adopt this view of the Tax Court, and, agreeing, we affirm on the commissioner's appeal.

On the taxpayers' appeals, we think it clear that the Tax Court fell into fundamental error in applying to the facts of this case the principle laid down and applied in Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406, Griffiths v. Helvering, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319, and Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355. This principle is that while real transactions between a corporation and its sole stockholder may not for the reason alone that the stock is solely owned be disregarded for tax purposes, transactions to be effective for such purposes must have reality, that is must achieve some legitimate business result, must not be mere tax dodging devices without business benefits or substance. This principle, sound enough when correctly apprehended and applied, has no application to facts like these. The Tax Court, we think, correctly interpreted Higgins v. Smith, supra, as supporting the view that the Gregory case may be regarded as a precedent "for the disregard of the transfer of assets by a corporation to its sole stockholder made not for a business purpose but solely to reduce tax liability", as authority, in short, for the view that transactions which do not in reality vary control, or change the business aspects of a situation are to be dismissed from consideration in determining tax incidents. But the very statement of the principle as the Tax Court sets it out, shows its complete inapplicability here. The only trans-

fer from corporation to stockholder in question is one made back to the stockholder in 1919 of cylinders which the company had acquired from him one short year before. It is not claimed that this transfer when made had, or was intended to have, tax consequences. There is certainly no proof that it had. It is undisputed that from 1911, before there were income taxes to be paid, until the dissolution of the company in 1941, Parker-Browne never owned any cylinders but always rented them except for the one year, 1918-1919, after the Greenspun transfer to it. It is undisputed too that the cylinders transferred to it by Greenspun and back to Greenspun one year later were only a small part of the cylinders for which it paid rental in the tax years in question, and that at no time until this tax controversy has any doubt been cast upon or any adverse claim made to the title in Greenspun, first, and Greenspun Trust No. 1, later.

These being the facts, it seems plain to us that the unreality in the situation lies not in the claim of title in Greenspun and Greenspun Trust No. 1, but in the claim of title in the corporation. In the first place, the transfer, made in 1919 and acted on for more than twenty years since, merely restored conditions existing for seven years before and interrupted for only one as to those cylinders conveyed. But even more unreal, under the undisputed facts, is the finding that not only should the transfer as to these cylinders, which for more than twenty years all of the parties concerned have treated as real, be disregarded, but that the other cylinders, which were never at any time owned by the corporation, have by some strange process of devolution passed to and become the property of the corporation.

■ The fact that the corporation paid rentals for the cylinders, which gave a large return on the value ascribed to them, undoubtedly has a bearing upon the question of whether the rental paid was to the full extent a legitimate business expense properly deductible. But the facts not being in dispute as to who really owned the cylinders and whether the form the ownership took was a mere tax dodging device,

the size of the rentals could have no bearing whatever on the question of the title to the cylinders and who in fact owned them. The Tax Court's finding, therefore, that Parker-Browne Company and not the Greenspun Trust No. 1 is the owner of the cylinders is not a finding of fact. It is mere fiating and its decision that no rentals may be allowed Parker-Browne as expenses and all of them must be charged to Greenspun as informal dividends, while a logical enough deduction from the assumed premise, is error in law and must be reversed.

■ This is not to hold that Parker-Browne may have its claim to rentals allowed in full or that some of the amounts paid as rentals may not be charged to Greenspun as informal dividends. It is quite clear that the contrary is true. The provisions of the rental agreement providing for increasing the rental at the will of the corporation and according to its profits on the gas from the minimum of one cent to a maximum of three cents per pound on all gas sold are in their nature such that they cannot as to sums in excess of one cent be regarded as fixing obligatory rentals. All such sums must, therefore, be regarded not as rentals obligatorily paid the trust but as informal dividends to Greenspun funnelled by his direction to the trust. All payments then over the one cent minimum should be disallowed as rentals and charged to Greenspun as dividends. As to the payments up to the one cent minimum, these should be treated as rental payable to Greenspun Trust No. 1, as owner of the cylinders and deductible by Parker-Browne, as business expenses except to the extent that on a rehearing they are shown to be excessive and unreasonable and therefore not necessary and proper business expenses.

As to the claims for bad debt deductions, the Tax Court made no findings of fact. Indeed, it disposed of the issues with the statement that "because of the paucity of material or relevant evidence, we have been unable to include in our findings hereinabove any facts in respect of this issue." Then, after discussing the testimony of the petitioner and his attorney,

it denied the claims on the ground that "petitioner did not prove (1) that there was a valid existing indebtedness in the aggregate amount claimed to be allowable, and (2) that the debts became worthless within the taxable year 1940, *and such evidence is wholly lacking*" (emphasis supplied). Its conclusion that such evidence is wholly lacking as to No. 1 is contrary to the agreement of the parties that there was a valid existing indebtedness in the amount claimed. Its conclusion that such evidence is wholly lacking as to No. 2 ignores undisputed testimony. Without at this time undertaking to decide what weight should be given to the evidence thus ignored, we send the issues as to the bad debts back to the Tax Court for complete findings of fact as to (1) the existence of the debt, and (2) whether it became worthless within the taxable year 1940, and for its determination of the legal effect of the facts so found.

On the commissioner's appeal, the judgment is affirmed. On the taxpayers' appeals, it is reversed and the cause is remanded for further and not inconsistent proceedings.