L. W. Tilden, Inc. v. Commissioner.L. W. Tilden, Inc. v. CommissionerDocket No. 20082.United States Tax Court1950 Tax Ct. Memo LEXIS 247; 9 T.C.M. (CCH) 219; T.C.M. (RIA) 50066; March 16, 1950*247 Douglas D. Felix, Esq., Miami, Fla., for the petitioner. Newman A. Townsend, Jr., Esq., and F. L. Van Haaften, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: The respondent determined the following deficiencies: ExcessDeclared Value Ex-25%YearIncome TaxProfits Taxcess-Profits TaxPenaltyFiscal year ended September 30, 1943$3,299.98$116,395.10$29,098.78Fiscal year ended September 30, 19445,024.47142,097.65$1,670.38The case was submitted upon oral testimony and exhibits, and the parties agreed at the hearing that the entire record in L. W. Tilden, Inc., Docket No. 3455, shall be considered as part of the record in the instant proceeding. Issue I The first issue raised by the pleadings herein relates to the disallowance by the respondent of an operating loss carry-over from the fiscal year ended September 30, 1943, to the fiscal year ended September 30, 1944, in the amount of $7,338.13. This issue depends upon the final determination of other issues and will be disposed of in recomputation under Rule 50. Issue II This issue relates to the disallowance by the respondent of depreciation claimed as a deduction by the petitioner in the sum of $11,076.40 *248 for the fiscal year ended September 30, 1943, and in the sum of $10,659.60 for the fiscal year ended September 30, 1944. An alternative issued raised by the respondent relating to the proper rate of depreciation on petitioner's citrus groves becomes moot in the event the primary issue is decided for respondent. Whether or not the respondent erred in disallowing the depreciation deductions claimed by petitioner depends upon whether he correctly applied the provisions of section 112(b)(5) of the Revenue Act of 1936, as amended, to an exchange in 1936, when petitioner was organized, of all of its capital stock for an equity in certain citrus groves, farms lands and personal property. The respondent determined in his notice of deficiency that this exchange was a nontaxable transaction under section 112(b)(5), supra, and that the petitioner's basis for the assets acquired was, therefore, under section 113(a)(8) of the Internal Revenue Code, the cost of those assets to the transferor or transferors rather than their fair market value at the time of the exchange. He made the same determination for the fiscal years of the petitioner ended September 30, 1941, and September 30, 1942, in Docket *249 No. 3455, and this determination was contested by the petitioner, hearings held, and Findings of Fact and Opinion promulgated by this Court in L. W. Tilden, Inc., 12 T.C. 507, March 30, 1949. As heretofore noted, the parties have placed in evidence in the instant proceeding the entire record in Docket No. 3455. Inasmuch as the issue relating to petitioner's basis for depreciation is the same issue as was litigated in Docket No. 3455, except that different years are involved, we adopt the findings of fact made in L. W. Tilden, Inc., 12 T.C. 507, as our findings in the instant proceeding, and hold, as was held in that case, and for reasons set forth in the opinion rendered therein, that the basis of the assets acquired by petitioner in the 1936 exchange is the cost thereof to the transferor or transferors. It follows that the respondent did not err in disallowing the depreciation deductions claimed by petitioner. Issue III Did the respondent err in his determination that the net income of the Tilden Joint Venture for the fiscal years ended September 30, 1943, and September 30, 1944, was taxable to the petitioner? Findings of Fact L. W. Tilden, Inc., hereinafter referred to as the petitioner, *250 was during the fiscal years ended September 30, 1943, and September 30, 1944, a corporation duly organized and existing under the laws of Florida with its principal place of business at Winter Garden, Florida. Its income and declared value excess-profits tax return for the fiscal year ended September 30, 1943, and its income and excess profits tax returns for the fiscal year ended September 30, 1944, were filed with the collector of internal revenue for the district of Florida. Luther W. Tilden was married to Jennie May Tilden, and they were the parents of the following children: Clarence G. Tilden, L. W. Tilden, II, Harold C. Tilden, Gladys Mae Hudnall, Grace Margaret Stark, Robert W. Tilden, Doris Tilden Davis, Frederick T. Tilden, and Virginia Tilden Holtsclaw. Gladys Mae Hudnall is sometimes referred to in the record as Gladys Mae Robinson; Doris Tilden Davis is sometimes referred to as Doris T. Freundlich; and L. W. Tilden, II, is sometimes referred to as L. W. Tilden, Jr., or "Billy" Tilden. Luther W. Tilden, Sr., died January 6, 1941. Virginia T. Holtsclaw was the youngest child, and she became 21 years of age in 1936. The petitioner was organized as a Florida corporation in *251 1936 by Luther W. Tilden, Sr., and four of his children. Its authorized capital was $100,000 which was divided into 1,000 shares of common stock with a par value of $100 per share. Shortly after its organization the petitioner acquired an equity in certain citrus groves and personal property through deeds executed by the various members of the Tilden family, except Virginia, and stock certificates were prepared as follows: No. ofNameSharesL. W. Tilden100Jennie May Tilden100Clarence G. Tilden100Frederick T. Tilden100Doris Tilden Davis100Gladys Mae Robinson100Harold C. Tilden100Robert Willis Tilden100L. W. Tilden, II100Grace Tilden Stark100 The stock certificates were executed by the petitioner's officers and the corporate seal was attached. However, until sometime after the death of Luther W. Tilden, Sr., in 1941 the certificates remained in the stock book which was kept at times by Luther W. Tilden, Sr., and at other times by R. C. Davis, the petitioner's attorney. Subsequent to the death of Luther W. Tilden, Sr., the Probate Court of Orange County, Florida, awarded the 100 shares of stock outstanding in his name to Virginia T. Holtsclaw. The Probate Court's order is dated August 16, *252 1942, and shortly thereafter a certificate of 100 shares of petitioner's stock was prepared and issued to Virginia T. Holtsclaw. In 1936 Luther W. Tilden, Sr., was heavily indebted to the Exchange National Bank of Tampa, Florida, the Armour Fertilizer Works of Jacksonville, Florida, and several other creditors, and the petitioner was organized pursuant to plan to refinance this indebtedness. In accordance with this plan the petitioner, shortly after its organization, assumed Tilden's debts in the approximate amount of $292,000, and with additional funds borrowed from the Exchange National Bank it compromised and paid off the claims of all creditors except the Bank and Armour Fertilizer Works. The refinancing was completed on or about December 5, 1936, and as a result the assumed indebtedness then consisted of notes secured by mortgages as follows: Mortgage payable - Exchange Na-tional Bank$ 50,232.36Mortgage payable - Exchange Na-tional Bank70,000.00Mortgage payable - Exchange Na-tional Bank22,000.00Mortgage payable - Armour Ferti-lizer Works118,971.93Total$261,204.29The notes and mortgages held by the Exchange National Bank and Armour Fertilizer Works, bearing 6 per cent interest, *253 were payable as follows: E.N.B.E.N.B.E.N.B.MortgageMortgageMortgageArmour MortgageYear$50,232.36$22,000.00$70,000.00$118,971.93July 1, 1937$ 7,333.33$7,333.33July 1, 19387,333.337,333.33July 1, 19397,333.337,333.33July 1, 19401,412.00$ 3,500.00July 1, 19411,412.003,500.005% of principalJuly 1, 19421,412.003,500.005% of principalJuly 1, 19431,412.003,500.005% of principalJuly 1, 19441,412.003,500.005% of principalJuly 1, 19451,412.003,500.005% of principalJuly 1, 194619,760.3649,000.00Balance of principal Each of the four mortgages required the petitioner to pay the interest annually, and, in addition, the Armour Fertilizer Works mortgage provided as follows: "The Mortgagor covenants and agrees that it will pay in addition to the amounts specified in this mortgage, and the two mortgages to the Exchange National Bank of Tampa, and the extension agreement between the Mortgagor and the Exchange National Bank of Tampa a sum equal to fifty percent (50%) of the net profits of the said corporation derived from the sale of citrus fruits grown and produced on the properties described in this mortgage, the two mortgages to the Exchange National Bank of Tampa and the extension agreement, in the *254 following order: "1st: To retire the two mortgages given by the Mortgagor to the Exchange National Bank of Tampa, said mortgages being dated the 1st day of December, A.D. 1936, and totalling the sum of $44,000.00. "2nd: After the above mentioned mortgages to the Exchange National Bank of Tampa have been retired in full, then the same to be paid pro-rata to the Exchange National Bank of Tampa and ARMOUR FERTILIZER WORKS, Division of ARMOUR AND COMPANY of DELAWARE, a corporation, until the entire obligation due the Exchange National Bank of Tampa and ARMOUR FERTILIZER WORKS, Division of ARMOUR AND COMPANY of DELAWARE, a corporation, have been paid." The citrus groves which the petitioner acquired in the 1936 exchange for its capital stock had a fair market value as of October 16, 1936, of approximately $577,200. Other assets were also acquired in the exchange by the petitioner as follows: Cash$17,546.02Farm Machinery and Equipment11,475.00Accounts Receivable12,000.00$41,021.02 The opening entries on the petitioner's books are dated October 1, 1936, and show the following assets and liabilities: AssetsCash$ 17,546.02Accts. Receivable12,000.00Trees (Itemized)336,567.75Land (Itemized)175,725.00Buildings (Itemized)27,600.00Irrigation Equipment41,910.00Farm Machinery and Equipment11,475.00Total Assets$622,823.77LiabilitiesMortgages Payable (Itemized)$150,164.29Notes Payable (Itemized)119,906.09Capital Stock100,000.00Capital Surplus252,753.39Total Liabilities$622,823.77*255 These books were prepared and opened in 1942 after the death of Luther W. Tilden, Sr. The citrus groves and other depreciable property were set up on these books at a stepped-up basis which was predicated upon their approximate fair market value on October 1, 1936. In an agreement entered into between petitioner and the Armour Fertilizer Works under date of December 1, 1936, petitioner agreed, among other things, not to convey, and/or lease the mortgaged property during the life of the mortgage without the written consent of Armour. From 1936 until his death in 1941 Luther W. Tilden, Sr., served as the petitioner's president and was in active charge of all its operations. During this period Clarence G. Tilden was vice president of the petitioner and Frederick T. Tilden was its secretary and treasurer. After the death of Luther W. Tilden, Sr., new officers were elected for the petitioner. The election was held February 8, 1941, and the new officers were as follows: Clarence G. TildenPresidentHarold C. TildenVice PresidentL. W. Tilden, IISecretary and Treasurer The petitioner's minute book does not show any change of corporate officers since February 8, 1941. The petitioner maintained *256 its books of account on the basis of a fiscal year ending September 30th. For the fiscal years ended September 30, 1937, to September 30, 1942, inclusive, the petitioner's net income per books (before income taxes) was as follows: YearNet IncomeNet Loss1937$29,816.401938$38,466.491939269.361940400.84194133,454.91194266,362.89 In arriving at net income per books depreciation was computed upon the stepped-up basis of the petitioner's depreciable assets. After his father's death in 1941 L. W. Tilden, II (sometimes called Billy Tilden) became general manager for the petitioner and was thereafter in charge of its operations. For the fiscal year ended September 30, 1941, he received a salary of $900 from the petitioner, and for subsequent fiscal years through September 30, 1944, a salary of $2,400 per year. In the fiscal year ended September 30, 1945, the petitioner paid him a salary of $600. In Florida the citrus crop harvest begins in October and ends in June or July of the following year. The crop years 1940-1941 and 1941-1942 were generally good for Florida citrus growers, and on August 19, 1942, L. W. Tilden, II, wrote Armour Fertilizer Works, one of the petitioner's mortgage creditors, *257 stating that petitioner had had a very successful year, both on production and sales, that it was faced with a very serious tax problem, and that they were trying to work out a solution of this problem. R. C. Pribble, a public accountant in Orlando, Florida, was employed by the petitioner in 1941 to do its accounting and prepare and file its tax returns. In the summer of 1942 a controversy existed between the petitioner and representatives of the Commissioner of Internal Revenue about the basis of its depreciable assets. This controversy hinged upon whether or not the 1936 exchange of petitioner's stock for various properties was a taxable or a nontaxable transaction. If the exchange was nontaxable as representatives of the Commissioner of Internal Revenue contended, the petitioner's basis for its depreciable assets was approximately $60,000. Faced with the possibility of this basis and petitioner's low equity invested capital for excess profits tax, Pribble became concerned about the effect of the excess profits tax upon petitioner's income. He estimated that after payment of excess profits taxes there would only be about ten per cent of petitioner's income available for payment of *258 its mortgage indebtedness and that petitioner could not meet its obligations under the mortgages with such a small percentage of its income. He devised a plan whereby the individual members of the Tilden family would lease from petitioner its properties and operate them as a joint venture. Under date of August 25, 1942, he wrote identical letters to the two mortgage creditors asking for their approval of the plan. The substance of the plan was set forth in these letters as follows: "In connection with high income and excess profits tax on corporations it has been suggested that the Corporation lease lands, buildings, groves and equipment to a Joint Venture composed of all members of the Tilden family. This lease would be drawn providing for annual rental in an amount sufficient to cover interest, taxes and depreciation and there would therefore be no taxable income to the Corporation. Lands thus leased to the Joint Venture would be operated by the Joint Venture and all profits would accrue to members of the Joint Venture, Income Taxes being paid by these members, so that there would never be any excess profits tax." At a meeting held on September 21, 1942, a proposed lease of all petitioner's *259 personal and real property was submitted to its board of directors and a motion was adopted directing its officers to execute the lease and take necessary steps to put the transaction in effect. The lease executed on September 26, 1942, by petitioner, as lessor, and L. W. Tilden, as lessee, stated that the lessor on that day leased its farms and farm lands, groves and grove lands, together with all livestock, farm machinery and appliances and irrigating machinery and applicances, for a period of five years beginning on the 30th day of September 1942, and ending on the 30th day of September 1947, for the purpose of farming. The lessee agreed to pay a rental of $30,000 per year on the first day of July of each year, to manage, cultivate, fertilize, irrigate, prune and care for all citrus trees, at his own cost and expense, to repair and maintain all machinery, to furnish all labor necessary for the operation, irrigation, care and cultivation of the groves, and to care for and maintain all livestock. The lessor agreed to pay all taxes, County, State and National, due upon the premises. The lease was recorded in the public registry of Orange County, Florida, on September 28, 1942. Thirty *260 thousand dollars per annum was a fair rental for the citrus groves of petitioner. When this lease was executed on September 26, 1942, the petitioner's capital stock was owned by the following persons: Per centof StockNo. ofName of StockholderOwnedSharesDoris Tilden Davis10100Harold C. Tilden10100Grace Margaret Stark10100R. W. Tilden10100F. T. Tilden10100Clarence G. Tilden10100L. W. Tilden, II10100Jennie May Tilden10100Virginia Tilden Holtsclaw10100Gladys Mae Hudnall10100Total1001,000 On October 1, 1942, the stockholders of petitioner entered into an agreement. After reciting that L. W. Tilden was the lessee of certain orange groves under a lease entered into between him and petitioner, and that Jennie May Tilden held a 6 per cent interest in said enterprise, Clarence G. Tilden 13 per cent, H. C. Tilden 8 per cent, R. W. Tilden 9 per cent, F. T. Tilden 3 per cent, Gladys Mae Hudnall 13 per cent, Grace Margaret Stark 13 per cent, Doris Tilden Davis 12 per cent, and Virginia Tilden Holtsclaw 12 per cent, and were desirous of becoming joint adventurers of the ownership of the lease and in the profits arising from the operation and management of the groves, the agreement provided: * * *"IT *261 IS AGREED AS FOLLOWS: That for and in consideration of the sum of One Dollar, and other valuable considerations each to the other in hand paid, the receipt whereof is hereby mutually acknowledged, the said parties hereto shall and do become joint adventurers, each contributing to the fund necessary to carry out the terms and conditions of the said Lease in the proportion set opposite their names and shall participate in the profits in the same proportion. "IT IS FURTHER AGREED that L. W. Tilden shall superintend, control and manage the citrus groves located on said property, including the cultivation and fertilization thereof, and shall pick, pack and market, or otherwise dispose of as his judgment shall dictate, the citrus crop growing on the lands described in said Lease. "IT IS FURTHER AGREED that the said L. W. Tilden shall receive as compensation for his services above mentioned the sum of $2400 per annum, payable in monthly installments * * *. On the day of of each and every year hereafter the said L. W. Tilden shall render a report to all of the parties hereto and account for all sums of money coming into his hands by virtue of his said employment, and the profits from said *262 enterprise, after deducting all necessary costs, charges and expenses, including reserves necessary to carry on the operation of said venture until the harvesting and sale of the ensuing crop, shall be distributed among the parties hereto in proportion to their interest above set out. * * *"IT IS FURTHER AGREED BETWEEN THE PARTIES HERETO that this joint venture shall exist for the period of time that the certain Lease, executed by and between L. W. TILDEN, INC. , and L. W. TILDEN on the 26 day of September, 1942, remains in full force and effect." * * *The joint venture formed by the petitioner's stockholders on October 1, 1942, was known as the "Tilden Joint Venture". Its operations were conducted under the general management and supervision of L. W. Tilden, II, who was also the petitioner's general manager and secretary and treasurer. There were separate books of account for the petitioner and the Tilden Joint Venture. The books of the joint venture show that none of its members contributed any capital to its operations. The fair market value of the properties leased by the petitioner to L. W. Tilden, II, was between $500,000 and $600,000 on October 1, 1942. Between December 31, *263 1936, and September 30, 1942, the petitioner reduced its mortgage indebtedness from $261,204.29 to $180,783.75 as follows: AmountBalanceDatePaidDueExchange National Bank Mortgage - $50,232.36 - 6%4- 9-37$7,333.336-26-377,333.336-24-397,333.336-26-401,412.006-11-411,412.006-27-421,412.009-30-42$ 23,996.37Exchange National Bank Mortgage - $70,000.00 - 6%6-26-403,500.006-11-413,500.006- 6-42(Proceeds sale ofland)3,838.756-27-423,500.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,661.25Exchange National Bank Mortgage - $22,000.00 - 6%4- 9-377,333.336-26-377,333.336-24-397,333.349-30-420Armour Fertilizer Works Mortgage - $118,971.93 - 6%6-26-405,948.606-14-415,948.606-27-425,948.609-30-42101,126.13Total Balance due - 9-30-42$180,783.75 At the time the petitioner and L. W. Tilden, II, executed their lease and the petitioner's stockholders formed the Tilden Joint Venture the 1942-1943 citrus crop was on the trees. It was possible at that time to make a rough estimate of what the marketable crop would be although the hazard of freezes or unusual weather was outstanding until completion of the harvest. The crops year 1942-1943, as well as the crop year 1943-1944, was exceptionally good for Florida citrus growers in both production *264 and prices, and on its tax returns filed for the fiscal years ended September 30, 1943, and September 30, 1944, the Tilden Joint Venture disclosed net profits of $155,276.83 and $187,497.49, respectively. For the same two fiscal years the petitioner's income tax returns disclosed the following: Fiscal Year Ended September30, 1943Rents$33,657.24Gross income$33,657.24Less: Compensation ofOfficers$ 2,400.00Insurance323.45Appraisal expense1,500.00Interest10,253.74Taxes7,255.12Depreciation18,211.38Other deductions1,051.68Total deductions40,995.37Net loss($ 7,338.13)Fiscal Year Ended September30, 1944Rents$33,355.70Gain from sale of capitalassets10,065.07Miscellaneous income.63Gross incsome$43,421.40Less: Compensation ofofficers$ 2,400.00Interest7,685.54Taxes8,721.36Depreciation16,720.93Net operating losscarry-over7,338.13Other deductions741.87Total deductions43,607.83Net loss($ 186.43) On the Tilden Joint Venture books the 1942-1943 and the 1943-1944 profits were allocated between the various members of the joint venture as follows: Name of MemberPercent1942-19431943-1944TotalL. W. Tilden, II11 **265 $19,216.45$22,760.72$ 41,977.17Jennie May Tilden69,172.6111,105.8520,278.46C. G. Tilden1319,873.9924,062.6843,936.67R. W. Tilden913,758.9116,658.7730,417.68F. T. Tilden34,586.305,552.9210,139.22H. C. Tilden812,230.1514,807.8027,037.95Gladys Mae Hudnall1319,873.9924,062.6843,936.67Grace M. Stark1319,873.9924,062.6743,936.66Doris T. Davis1218,345.2222,211.7040,556.92Virginia T. Holtsclaw1218,345.2222,211.7040,556.92$342,774.32 The members of the Tilden Joint Venture filed individual income tax returns for the calendar years 1943 and 1944 upon which each disclosed his or her share of the joint venture profits as allocated on the joint venture books. The Tilden Joint Venture paid the tax due on these returns, and the individual members of the joint venture subsequently refunded to the joint venture that portion of the tax which was due on their income from sources other than the joint venture. Except for the funds used to pay the income tax of the individual members of the joint venture on their respective shares of the 1942-1943 and 1943-1944 joint venture profits, no part of these profits has ever been distributed to any members of the joint venture. The salary of $2,400 per year authorized for L. W. Tilden, II, in the joint *266 venture agreement was credited to his individual account on the joint venture books, but it has never been withdrawn. On October 31, 1942, December 2, 1942, and December 31, 1942, the Tilden Joint Venture made payments of $200 each (total $600) to L. W. Tilden, II, but on February 1, 1943, he reimbursed the joint venture for these payments. During the joint venture's first fiscal year L. W. Tilden, II, on August 11, 1943, wrote the Exchange National Bank and Armour Fertilizer Works, on the letter head of L. W. Tilden, Inc., as follows: "Under advice of my attorneys, particularly Mr. Felix, of Miami, it was thought best to wait until the close of our fiscal year, September 30, before making any further principal retirement on our mortgages both to the Exchange National Bank and Armour Fertilizer Works. "By waiting until this time we can make an advance payment on the year's rent to L. W. Tilden, Inc. from the Tilden Joint Venture and use this money on mortgage payments. In doing this we will not cast an unfavorable light on the Tilden Joint Venture. "I had very much hoped that we would be able to make a substantial payment at this time but we do not wish to jeopardize any tax savings *267 that would result from this joint venture." Sometime thereafter, and during the fiscal year beginning September 30, 1943, the Tilden Joint Venture paid the petitioner $30,000 as the 1943-1944 rent and $15,000 on the 1944-1945 rent. The $15,000 item was carried on the books of the Tilden Joint Vonture during the 1943-1944 fiscal year as "Prepaid lease rental" and was carried on the petitioner's books as "Deferred income". Between September 30, 1943, and July 1, 1944, the petitioner's mortgage indebtedness was reduced from $180,783.75 to $124,360.96 as follows: Balance DueBalance DueDate9/30/42Payment7/1/44Exchange National Bank Mortgage$50,232.366%$ 23,996.376/26/43$ 1,412.00$ 22,584.37Exchange National Bank Mortgage$70,000.006%$ 55,661.2511/ 7/42$ 3,587.606/26/433,500.0010/11/4315,830.503/11/44Proceeds sale of land2,605.07$ 30,138.08Armour Fertilizer Works Mortgage$118,971.936%$101,126.1311/ 7/42$ 4,344.306/26/435,948.6010/11/4319,169.503/11/44Overpayment of interest25.22$ 71,638.51Unpaid balance - 7/1/44$124,360.96On or about July 1, 1944, the Tilden Joint Venture purchased the petitioner's notes and mortgages from the Exchange National Bank and Armour Fertilizer Works. The three *268 mortgages were assigned by the bank and Armour Fertilizer Works to the Joint Venture and they endorsed the notes to the joint venture "without recourse". The notes and mortgages were set up on the joint venture books as an asset in the amount of $124,360.33. The balance sheet per books of the Tilden Joint Venture at September 30, 1943, and September 30, 1944, was as follows: Assets19431944First National Bank, Winter Garden$147,363.51$ 25,782.57Petty Cash28.7921.82Notes Receivable - R. C. Pribble1,000.00Investments - L. W. Tilden, Inc. Mortgages124,360.33Investments - U.S. Bonds100,000.00Prepaid Lease Rental15,000.00Prepaid Taxes and Licenses26.25Interest Receivable17.85522.00Account Receivable - L. W. Tilden, Inc.3,931.66Total Assets$148,436.40$269,618.38LiabilitiesAccounts Payable - L. W. Tilden, Inc.$ 957.57Accrued Audit Expense500.00$ 500.00Total Liabilities$ 1,457.57$ 500.00Net WorthL. W. Tilden. Jr.$ 19,216.45$ 29,961.56Jennie May Tilden6,552.6115,450.94C. G. Tilden19,873.9932,265.97R. W. Tilden10,865.9125,163.89F. T. Tilden4,586.308,348.33H. C. Tilden9,445.1521,942.74Gladys Mae Hudnall19,873.9936,729.53Doris Tilden Davis Freundlich18,345.2234,164.93Virginia Tilden Holtsclaw18,345.2234,283.32Grace M. Stark19,873.9930,807.17Total Net Worth$146,978.83$269,118.38*269 The accountant who audited the books of petitioner and the joint venture and prepared their income tax returns advised the members of the joint venture that the balance in their accounts on September 30, 1944, should not be distributed because of pending tax litigation. At the time the 1944 returns were filed the validity of the lease-joint venture arrangement had not been questioned by representatives of the Commissioner of Internal Revenue. The balance sheets per books of the petitioner at September 30, 1942, September 30, 1943, and September 30, 1944, were as follows: Assets9/30/429/30/439/30/44Cash$ 53,441.35$ 7,026.19$ 7,508.75Accounts receivable15,743.0114,564.19(a)12,000.00Notes receivable25,000.0000Prepaid insurance85.11472.63266.11Land178,857.49178,857.49172,757.49Trees (less depreciation)261,617.19249,704.33238,080.98Buildings (less depreciation)26,110.8025,862.6025,614.40Irrigation equipment (less depreciation)34,908.2032,481.7630,055.32Farm Mchy. and equipment (less depreciation)12,631.589,034.446,611.50Office equipment (less depreciation)26.7400Goodwill13,200.0020,400.0027,600.00Organization expense17,938.2617,938.2617,938.26Claim for refund - excess profits tax373.88$639,559.73$556,341.89$538,806.69Liabilities and Net WorthMiscellaneous accounts payable$ 10,921.66$ 9,002.07$ 9,120.71Account payable - Tilden Joint Venture24,935.6003,931.66(b)Accrued interest, taxes, wages5,832.705,730.164,550.00Mortgages payable180,783.75(c)161,991.25124,360.33Account payable - attorney's fee13,200.0011,900.006,600.00Reserve for income taxes due27,332.4900Reserve for additional income tax prior years1,390.391,390.391,390.39Reserve for capital stock tax1,137.5000Reserve for additional income and excess profitstax - 19418,606.098,606.098,606.09Reserve for additional income and excess profitstax - 194212,878.5612,878.5612,878.56Reserve for additional income and excess profitstax - 19430116,005.08116,005.08Reserve for additional income and excess profitstax - 194400137,863.65Reserve for audit500.00250.00250.00Deferred income0015,000.00Capital stock100,000.00100,000.00100,000.00Capital surplus245,327.54245,327.44245,327.44Earned surplus6,713.45(116,739.25)(247,077.32)$639,559.73$556,341.89$538,806.69*270 (a) This balance at 9/30/43 includes the amount of $957.57 due by the joint venture to the petitioner. (b) This balance includes interest of $1,865.41 for period 7/1/44 to 9/30/44 on mortgages purchased by the joint venture. The balance of $2,066.25 represents money paid by the joint venture for the petitioner's benefit. (c) This balance represents the Exchange National Bank and Armour Fertilizer Works mortgages. On or about January 1, 1945, the lease between the petitioner and L. W. Tilden, II, was cancelled. Immediately thereafter, by a deed dated January 5, 1945, the petitioner conveyed its real estate and citrus groves, together with all agricultural crops, fruit on trees, buildings, farm machinery and equipment, irrigation equipment, autos, trucks, trailers, office equipment, insurance policies or other personal property located on the premises, to each of its stockholders as follows: UndividedName of StockholderInterest ReceivedJennie May Tilden1/10thGladys Mae Hudnall1/10thClarence G. Tilden1/10thGrace M. Stark1/10thHarold C. Tilden1/10thDoris T. Davis1/10thFrederick T. Tilden1/10thLuther W. Tilden, II1/10thVirginia T. Holtsclaw1/10thRobert W. Tilden1/10th This deed was recorded *271 in the public registry of Orange County, Florida, on January 6, 1945, and it does not recite either that the grantees assume or that the properties are transferred subject to an outstanding mortgage indebtedness. However, the deed did contain a general warranty clause which reads as follows: "And the said party of the first part (L. W. Tilden, Inc.) doth covenant with the said parties of the second part (members of the Tilden family) that it is lawfully seized of the said premises; that they are free of all encumbrances, and that it has good right and lawful authority to sell the same; and the said party of the first part does hereby fully warrant the title to said land, and will defend the same against the lawful claims of all persons whomsoever." (Words in parentheses supplied.) The distribution made by the petitioner on January 5, 1945, was recorded by appropriate entries on its books of account, and it is referred to on the books as a distribution in liquidation. On their individual income tax returns for the calendar year 1945 each of the petitioner's stockholders reported a gain from the "liquidation of L. K. Tilden, Inc.," as follows: Sales Price$84,170.23Cost (1936)32,039.31Gain$52,130.92Gain to be taken into account (50%)$26,065.46*272 The Tilden Joint Venture was not liquidated and did not dissolve when the lease between the petitioner and L. W. Tilden, II, was cancelled on or about January 1, 1945. It was still in existence at the time this case was heard on April 8-9, 1949. On or about January 5, 1945, a new joint venture, known as "L. W. Tilden Groves," was formed by the ten members of the Tilden family who were the petitioner's stockholders and participants in the old "Tilden Joint Venture." To this new joint venture the individual members of the Tilden family contributed as capital their undivided interests in the assets distributed to them on the same date by the petitioner. On the books of the L. W. Tilden Groves the opening entries are as follows: Citrus Trees$431,221.88Land207,522.62Buildings29,700.00Farm Machinery and Equipment14,940.00Irrigation Equipment56,900.00L. W. Tilden, Jr., Capital$ 74,028.45Jennie May Tilden, Capital74,028.45C. G. Tilden, Capital74,028.45R. W. Tilden, Capital74,028.45F. T. Tilden, Capital74,028.45H. C. Tilden, Capital74,028.45Gladys Mae Hudnall, Capital74,028.45Grace M. Stark, Capital74,028.45Doris Tilden Freundlich, Capital74,028.45Virginia Tilden Holtsclaw, Capital74,028.45To record acquisition by partnership of above listed fixed assetsas contributions of capital by the respective partners 1-5-45.L. W. Tilden, Jr., Capital Account$ 12,809.12Jennie May Tilden, Capital Account12,809.12C. G. Tilden, Capital Account12,809.12R. W. Tilden, Capital Account12,809.12F. T. Tilden, Capital Account12,809.12H. C. Tilden, Capital Account12,809.11Gladys Mae Hudnall, Capital Account12,809.11Grace M. Stark, Capital Account12,809.11Doris Tilden Freundlich, Capital Account12,809.11Virginia Tilden Holtsclaw, Capital Account12,809.11Mortgages Payable to Tilden Joint Venture *$124,360.33Accrued Interest to Tilden Joint Venture3,730.82To set up liability for mortgages outstanding against fixedassets received by stockholders of L. W. Tilden, Inc. inpartial liquidation of that Corporation.Cost of Fruit on Trees$262,782.25L. W. Tilden, Jr., Capital Account$ 26,278.23Jennie May Tilden, Capital Account26,278.23C. G. Tilden, Capital Account26,278.23R. W. Tilden, Capital Account26,278.23F. T. Tilden, Capital Account26,278.23H. C. Tilden, Capital Account26,278.22Gladys Mae Hudnall, Capital Account26,278.22Grace M. Stark, Capital Account26,278.22Doris T. Freundlich, Capital Account26,278.22Virginia T. Holtsclaw, Capital Account26,278.22*273 To set up on books value of citrus fruit on trees at 1-5-45 based on appraisal report submitted by Brass and McNutt. The above was contributed together with citrus groves and other property by the various partners to the capital of the partnership. This entry was omitted in recording opening entries in the books. There is no written joint venture agreement for the L. W. Tilden Groves. For the taxable period beginning January 5, 1945, and ending September 30, 1945, the partnership information return filed for the L. W. Tilden Groves disclosed the following: Sales$270,078.73Less: Cost of products purchased262,782.25Gross profit on sales$ 7,296.48Less: Expenses$65,669.08Depreciation26,201.0091,870.08Net loss$ 84,573.60Other income912.50Net loss$ 83,661.10Partner's share of net loss: L. W. Tilden, Jr.$ 6,746.11Jennie Mae Tilden8,546.11C. G. Tilden8,546.11R. W. Tilden8,546.11F. T. Tilden8,546.11H. C. Tilden8,546.11Gladys Mae Hudnall8,546.11Grace M. Stark8,546.11Doris T. Freundlich (FormerlyDoris T. Davis)8,546.11Virginia T. Holtsclaw8,546.11$83,661.10*274 The taxable period covered by the return is approximately 9 months or 3/4ths of a year. For the fiscal year ended September 30, 1945, the Tilden Joint Venture filed an original and an amended partnership information return, which disclosed the following: OriginalAmendedReturnReturnFiled 12/26/45Filed 1/15/46DifferenceInterest on notes(1) $1,865.41$ 7,461.62$ 5,596.21Interest Gov't Bonds1,500.721,500.720Income Citrus operations(2) 2,866.9910,366.997,500.00Total income$6,233.12$19,329.33$13,096.21Deductions000Ordinary net income$6,233.12$19,329.33$13,096.21(1) Interest on the L. W. Tilden, Inc. mortgages (unpaid principal - $124,360.33) at 6% for 3 months would be $1,865.41 and for 12 months would be $7,461.62. (2) The difference arises because rent in the amount of $15,000 was claimed as an expense on the original return while only $7,500 was claimed on the amended return. On both the original and amended returns the profits were allocated to the individual members of the joint venture in the proportions set out in the joint venture agreement. For the fiscal year ended September 30, 1945, the petitioner filed an original and an amended income tax return, which disclosed the following: *275 OriginalAmendedReturnReturnFiled 12/13/45Filed 1/30/46DifferenceRents$15,046.45$ 7,546.45$ 7,500.00Less: Deductions21,069.9721,069.970Net Loss$ 6,023.52$13,523.52$ 7,500.00The petitioner's balance sheet per books at September 30, 1945, was as follows: AssetsFirst National Bank - Winter Garden,Fla.$ 179.02Exchange National Bank - TampaFla.5.00Account Receivable - C. G. Tilden12,000.00Account Receivable - L. W. TildenGroves120.86Goodwill34,800.00Organization Expense17,938.26Claim for Refund - Excess ProfitsTaxes373.88Total Assets$ 65,417.02LiabilitiesAccount Payable - L. W. Tilden$ 8,600.00Account Payable - Tilden Joint Ven-ture21,801.25 *Account Payable - Gregory InsuranceAgency61.88Accrued Taxes7,535.75Reserve for Audit300.00E. W. & R. C. Davis - Attorneys5,400.00Reserve for Additional Income Taxes- Prior Years1,390.39Reserve for Additional Income andExcess Profit Taxes 19418,606.09Reserve for Additional Income andExcess Profit Taxes 194212,878.56Reserve for Additional Income andExcess Profit Taxes 1943116,005.08Reserve for Additional Income andExcess Profit Taxes 1944137,863.65Total Liabilities$320,442.65Net WorthCapital Stock$100,000.00Capital Surplus245,327.54Earned Surplus(260,600.84)Distribution in Liquidation(339,752.33)Total Net Worth$255,025.63*276 By journal entries entered on the petitioner's books at December 31, 1945, the five "reserve for income tax" accounts, the Exchange National Bank account, the goodwill account and the organization expense account were closed to earned surplus. Another journal entry bearing the same date records the distribution of all remaining assets and liabilities to the petitioner's stockholders and the surrender and cancellation of their stock. The accounts closed out on the petitioner's books by this final liquidating entry were taken up on the books of L. W. Tilden Groves, the new joint venture, by a journal entry dated December 31, 1945. In the transfer the capital accounts of the individual members of the new joint venture were charged in equal amounts. Among the accounts transferred from the petitioner's books to the books of L. W. Tilden Groves by the corresponding journal entries dated December 31, 1945, was the "Tilden Joint Venture" account. This was an intercompany *277 account which had been in existence on the petitioner's books since the formation of the Tilden Joint Venture in 1942, and it had contained balances as follows: DebitCreditSeptember 30, 1943$957.57September 30, 1944$ 3,931.66September 30, 194521,801.25December 31, 19457,500.00 On various dates during the fiscal years ending September 30, 1944, and September 30, 1945, the Tilden Joint Venture paid obligations of the petitioner, and appropriate entries were made in this account to record the petitioner's liability arising from such payments. The petitioner's liability for interest on the mortgages purchased by the Tilden Joint Venture covering the period of July 1, 1944, to January 5, 1945, was accrued in this account, but this interest accrual was removed by a charge dated September 30, 1945. There is also a credit entry of $7,500 in the account dated September 30, 1945, which is explained on the books as follows: To deferred income - To record refund of lease rental paid in advance for period 1-5-45 to 3-31-45 a/c cancellation of lease 1-5-45. On December 31, 1945, the credit balance in the account was reduced to $7,500 by an entry recording the cash payment of $16,301.25 to the Tilden *278 Joint Venture, and this $7,500 balance was closed out in the final liquidation and transferred to the L. W. Tilden Groves books. When the lease between the petitioner and L. W. Tilden, II, was cancelled on or about January 1, 1945, the petitioner had earned only $7,500 of the 1944-1945 rent. However, during the fiscal year ended September 30, 1944, the Tilden Joint Venture had made an advance payment of $15,000 on the 1944-1945 rent. Upon cancellation of the lease the petitioner did not refund the $7,500 overpayment of rent to the Tilden Joint Venture in cash but instead the overpayment was credited on its books to the intercompany account payable. There was a remaining credit balance of $7,500 in this intercompany account on December 31, 1945, when the petitioner's liquidation was completed, and this balance was transferred as an account payable to the books of the L. W. Tilden Groves. In the notice of deficiency the respondent determined that the Tilden joint venture income for the years ended September 30, 1943, and September 30, 1944, was taxable to petitioner rather than to the individual members of the joint venture. The persons listed in the joint venture agreement did not really *279 and truly intend to join together during the taxable years for the purpose of engaging in the business of operating the Tilden citrus groves as a joint venture for profit. Opinion The respondent contends that the leasejoint venture arrangement was merely a scheme designed to reallocate the petitioner's income among its stockholders for the purpose of avoiding excess profits taxes, that it should be disregarded, and that the income from the operation of the citrus groves was properly includible in the gross income of petitioner under the provisions of section 22 (a) of the Internal Revenue Code. In the alternative, he contends that the joint venture income was properly allocated to the petitioner under the provisions of section 45 of the Internal Revenue Code. The petitioner contends that this arrangement was a real and bona fide transaction, that there was a valid business reason for changing its business from that of an operator to that of a landlord; that the lease, effecting that change, provided for the payment of a fair rental to it; and that, after the execution of the lease, the members of the Tilden Joint Venture, with proprietary interests therein substantially different from *280 their stockholdings in petitioner, operated the groves and reported the income therefrom, under and in strict compliance with the terms and conditions of the lease. It urges, therefore, that the income derived from the operation of the citrus groves during the taxable years is taxable to the joint venture, and not to it. A "joint venture" has been defined to be a special combination of two or more persons, where, in some specific venture, a profit is jointly sought without any actual partnership or corporate designation. 48 C.J.S. 801. Joint ventures and partnerships are so similar in character that they are usually tested by the same rules. 48 C.J.S. 808. In Commissioner v. Tower, 327 U.S. 280, where the government questioned the existence of a partnership for tax purposes, the court said: "* * * When the existence of an alleged partnership arrangement is challenged by outsiders, the question arises whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in profits or losses or both. And their intention in this respect is a question of fact, to be determined from testimony disclosed by their 'agreement, considered as a whole, *281 and by their conduct in execution of its provisions.' * * * We see no reason why this general rule should not apply in tax cases where the government challenges the existence of a partnership for tax purposes. * * *" And in Commissioner v. Culbertson, 337 U.S. 733, after referring to the above quotation from the Tower case, the court said: "The question is * * * whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *" The burden of proving that the stockholders of petitioner entered into the leasejoint venture arrangement with the intention of joining together for the purpose of carrying on the citrus-grove business as a joint venture and sharing in its profits and losses was on the petitioner. These individuals who could best testify *282 as to this intention and as to the conduct of the business both before and after the lease was executed were conspicuous by their absence at the hearing. The absentees included not only the officers of petitioner and the members of the joint venture, but also L. W. Tilden, Jr., who, as manager both before and after the lease, could have given some enlightening testimony as to whether the formation of the joint venture produced a substantial change in the operation of petitioner's properties. At the hearing petitioner produced four witnesses, three of whom expressed the opinion as experts that the $30,000 rental specified in the lease was a fair rental for its groves, and the fourth was an accountant whose services were engaged by petitioner in 1941. He testified that his office was in Orlando, Florida; that the original book entries were made by a bookkeeper in Winter Garden, Florida; that they were brought to his office and there incorporated in a set of books at the end of the year; and that at that time his firm makes an audit of the books and from the result of the audit the income tax returns for the year are prepared. He expressed familiarity with the terms of the lease and joint *283 venture agreements, and stated that after his engagement as an auditor and accountant he scrutinized all of the income tax returns and books and records of petitioner. He came to the conclusion in 1942 that either the mortgage creditors or the government would own the petitioner's property in a short while because in his opinion it was not possible for petitioner to pay the mortgage indebtedness with what was left after excess profits and other taxes had been paid. He thought petitioner would lose its property because of these taxes, even though the property had been appraised at between $500,000 and $600,000 which was substantially in excess of the amount of the mortgage indebtedness. He testified that, in the interest of the preservation of the property, he advised the formation of the joint venture and the division of the income among the various joint ventures. He also advised the officers of petitioner as to the rental that should be paid, and in his letters of August 25, 1942, to the mortgage creditors he stated that the annual rental in the lease was to be an amount sufficient to cover interest, taxes and depreciation so that there would be no taxable income to the corporation. *284 "Lands thus leased to the Joint Venture," said the accountant in those letters, "would be operated by the Joint Venture and all profits would accrue to members of the Joint Venture, Income Taxes being paid by these members, so that there would never be any excess profits tax." In the letters to the two mortgage creditors they were asked whether or not they would approve the proposed lease and joint venture agreement to take effect October 1, 1942. The approval of the Armour Fertilizer Works was apparently asked because an agreement between this firm and petitioner, dated December 1, 1936, provided, among other things, that petitioner would not convey and/or lease the mortgaged premises during the life of the mortgage without the written consent of Armour. Any replies received are not in evidence, and we, therefore, do not know whether any approval given was unconditional, or whether it was conditioned upon the application of the income, after expenses, to the payment of the mortgage indebtedness and the continuance of L. W. Tilden, Jr., as the manager of the citrus groves. Two agreements were excuted - one the five year lease between petitioner and L. W. Tilden, Jr., which provided *285 that the latter should care for and manage the leased property and pay petitioner a rental of $30,000 per annum, and the other providing that all of petitioner's stockholders should become adventurers "of the ownership of said Lease, and in the profits arising from the operation and management of the groves." The joint venture agreement stated that petitioner's stockholders were holders of interests in the enterprise ranging from 3 per cent to 13 per cent. How these varying interest were determined is not disclosed even though petitioner's counsel was asked about them and stated in his opening statement that "I guess the evidence will show it." The agreement further provided that the joint adventurers would contribute to the fund necessary to carry out the terms and conditions of the lease. The members of the joint venture contributed no capital to the enterprise. Obviously the joint venture had to acquire funds to take care of harvesting and other expenses during the fiscal year immediately following the execution of the lease and joint venture agreements. If the members of the joint venture did not furnish them, they had to come from some source pending the receipt of proceeds of *286 the sale of the citrus crop. One source may have been the Exchange National Bank as its vice president and trust officer testified (Docket No. 3455) that after petitioner was incorporated "supplemental loans were made from time to time by the bank to kind of carry over the corporation during the marketing season until 1944 when our indebtedness was paid off." This and other courts have repeatedly given recognition to the principle that a taxpayer has the right to reduce its taxes by any legal means and is not required to operate a business in the form most advantageous to the government tax-wise. It follows that the petitioner and its stockholders had the right to change the manner of operating its groves. But any change must have a business and not merely a tax-saving purpose and the fact that a family-owned corporation and members of the family which own its stock are involved in the change requires that it be subjected to careful scrutiny to determine whether it is in fact what it appears to be in form. The only reason given for making the change was that expressed by the accountant employed by petitioner, viz., preservation of petitioner's property. Of course, if it appeared from *287 the evidence that there was some likelihood that petitioner would lose its property and that the lease-joint venture arrangement provided for the receipt by petitioner of a greater income, after taxes, than it would have received if the lease had not been made, the reason given would have substance. But the rental provided in the lease was measured by the amount of petitioner's deductions for interest, taxes and depreciation, and it did not give petitioner any means for preserving its property that it would not have had if the lease and joint venture agreements had never been executed because under the terms of the joint venture agreement all profits, after expenses, were to be distributed to its members. Assuming therefore arguendo that there was some likelihood that petitioner might not be able to meet its mortgage payments if the government was to take a substantial part of its income in the form of excess profits taxes, the lease-joint venture arrangement did not provide a solution as under it petitioner would receive less income, after taxes, to pay its mortgage obligations than it would have received had it never been executed. Looking at the language of the joint venture agreement *288 alone its purpose was to create a separate and independent enterprise to operate the citrus groves for a period of five years as a joint venture and its profits were to be distributed to its members. If this language expressed the true intent of the parties, the joint venture was to be operated for the benefit of its members and not for the benefit of petitioner. However, the conduct of the parties in executing its provisions convinces us their intention was otherwise. The lease-joint venture arrangement called for the leasing of the citrus groves for a period of five years to one member of the Tilden family; management of the groves by him; payment to him by the joint venture of a salary of $2,400 per annum; the joining with him of other members of the family in a joint venture; contributions to the capital of the enterprise by such members; and the distribution to them of profits, after expenses. What actually transpired was that the groves continued to be operated by the same person who had operated them for petitioner; he was credited with the $2,400 salary on the books set up for the joint venture, but no salary was actually withdrawn; he was paid a salary of $2,400 per annum *289 by petitioner during the taxable years; no member of the joint venture contributed any capital to the enterprise; although profits, after expenses were deducted, were credited to the members no distributions were made to them except of amounts sufficient to pay income taxes upon the joint venture income reported by them; the profits were accumulated and a substantial portion of them used to pay petitioner's mortgage indebtedness on July 1, 1944; the lease was cancelled on January 1, 1945, over two years prior to the expiration of the five-year period and the petitioner was liquidated; another joint venture also composed of petitioner's stockholders was formed to operate the citrus groves; and the old joint venture continued in existence, and was still in existence when this case was heard, although the agreement creating it provided that it should exist only for the period that the lease was in full force and effect. After a careful consideration of all of the evidence submitted in this proceeding, we are convinced that the sole purpose of the members of the Tilden family and stockholders of petitioner in creating the leasejoint venture arrangement was to avoid the payment of excess *290 profits taxes by petitioner and apply the tax savings thus realized to the payment of its mortgage indebtedness. The meticulous care taken to see that no member profited from the joint venture, not only during the taxable years but long after the lease had been cancelled, clearly indicates that its members considered it to be of doubtful validity and had no intention of distributing profits to themselves in the ratio set up in the agreement. The lack of this intention, the failure to carry out other provisions of their agreements as heretofore noted, and the other evidence presented for our consideration, seems to us to justify the conclusion that the persons listed in the joint venture agreement never really and truly intended to join together for the purpose of carrying on a joint venture for profit. We have made a finding of fact to this effect, and hold that the respondent did not err in including the income of the Tilden joint venture in petitioner's gross income for the taxable years. Having determined that the income of the joint venture is taxable to petitioner under the provisions of section 2 (a) of the code, we do not deem it necessary to discuss or decide the alternative *291 contention of respondent. Issue IV Is the petitioner liable for a 25 per cent delinquency penalty because of its failure to file an excess profits tax return for the fiscal year ended September 30, 1943? Findings of Fact The petitioner, on December 3, 1942, filed an excess profits tax return, for the fiscal year ended September 30, 1942, upon which it disclosed an excess profits tax liability of $8,053.30. The petitioner's tax return for the fiscal year ended September 30, 1943, were due on or before December 15, 1943, but the petitioner filed no excess profits tax return for that year. The petitioner's accountant advised its officers that an excess profits tax return for the fiscal year ended September 30, 1943, was unnecessary. The petitioner filed an excess profits tax return for the fiscal year ended September 30, 1944. This return was filed December 15, 1944. During the period from December 3, 1942, to December 15, 1944, a controversy existed between the petitioner and representatives of the Commissioner of Internal Revenue about the basis of petitioner's depreciable assets. Petitioner's accountant advised its officers to file the 1944 return because of this controversy. At the *292 time the 1944 return was filed the validity of the lease-joint venture arrangement had not been questioned by representatives of the Commissioner. Petitioner's failure to file an excess profits tax return for the fiscal year ended September 30, 1943, was not due to reasonable cause. Opinion Section 291, Internal Revenue Code, provides penalties for failure to make and file a return and places the burden on the taxpayer to show that such failure was due to reasonable cause and not due to willful neglect. As heretofore noted none of the officers of petitioner testified in this proceeding and the proof submitted to show reasonable cause for failure to file an excess profits tax return for the year ended September 30, 1943, is based on the testimony of a public accountant. He had over 20 years experience in the practice of accountancy, and in 1937, he took an examination given by the Treasury Department and obtained a card admitting him to practice before that Department. As an accountant he had prepared a large number of tax returns for his clients and had represented many of them before the Treasury Department. He was first employed by petitioner in 1941 to handle all accounting matters *293 for petitioner and to prepare and file its tax returns. Since 1941 petitioner has continuously accepted his advice as to what returns should be filed, and he advised the officers of petitioner that it was not necessary for it to file an excess profits tax return for the year ending September 30, 1943. The petitioner contends that, inasmuch as its accountant advised that a 1943 excess profits return was not necessary, it had reasonable grounds for not filing such a return. We do not agree. The decision as to whether an excess profits tax return was or was not necessary for the fiscal year ended September 30, 1944, was dependent upon the validity of the lease-joint venture agreement. Transactions between a family corporation and its stockholders with a view to tax avoidance are subject to close scrutiny, and the officers of petitioner, in the exercise of reasonable business care and prudence, should have consulted some qualified tax adviser. The accountant's belief that no return was necessary was undoubtely based upon his judgment that the lease-joint venture arrangement was valid and would, as he planned, relieve the petitioner of excess profits taxes. But the record does not show *294 that he was an expert in Federal tax law, and the fact that he had a United States Treasury card is not compelling evidence that he had "expert knowledge" in this field. Hermax Co., Inc., 11 T.C. 442; affd., 175 Fed. (2d) 776. Obviously, an accountant may be well qualified to handle a taxpayer's books and prepare and file his returns, and yet not possess the qualifications to determine the validity of a lease-joint venture arrangement for tax purposes. In passively accepting the opinion of such an accountant that the lease-joint venture arrangement was valid and that no return was necessary, the petitioner did not exercise the reasonable care required by the statute. Respondent did not err, therefore, in determining that it was liable for the statutory penalty. Hermax Co., Inc., supra.See also Haywood Lumber & Mining Co., 12 T.C. 735, 740; P. Dougherty Co., 5 T.C. 791; affd., 159 Fed. (2d) 269; Lawrence Block Co., Inc., 12 T.C. 366, and Heatbath Corporation, 14 T.C. 332, promulgated March 1, 1950. Decision will be entered under Rule 50. Footnotes*. L. W. Tilden, II, was allocated a salary of $2,400 per year plus 11% of the profits. The computation follows: ↩19431944Joint venture net profit$155,276.83$187,497.49L. W. Tilden, II, salary2,400.002,400.00Net profit after salary$152,876.83$185,097.4911% net profit after salary16,816.4520,360.72Plus: Salary2,400.002,400.00Amount credited to L. W. Tilden, II, account$ 19,216.45$ 22,760.72*. These are the Exchange National Bank and Armour Fertilizer Works mortgages which were executed by the petitioner and assigned to the Tilden Joint Venture on 7/1/44.↩*. Represents money paid by the Joint Venture for the benefit of the Corporation, money advanced to the Corporation by the Joint Venture, and Soil Conservation due to the Joint Venture collected by the Corporation ($1,060.00).↩