### L. W. TILDEN, Inc. v. COMMISSIONER OF INTERNAL REVENUE.
### No. 13522.

United States Court of Appeals
Fifth Circuit.
Nov. 23, 1951.

Douglass D. Felix, Miami, Fla., for petitioner.

Irving I. Axelrad, Ellis N. Slack, Lee A. Jackson, Sp. Assts. to Atty. Gen., Theron L. Caudle, Asst. Atty. Gen., Charles Oliphant, Chief Counsel, Claude R. Marshall, Sp. Atty., Bureau of Internal Revenue, Washington, D. C., for respondent.

Before HUTCHESON, Chief Judge, and HOLMES, and STRUM, Circuit Judges.

JOSEPH C. HUTCHESON, Chief Judge.

These are petitions to review Tax Court decisions in Causes Nos. 3455 and 20082, determining deficiencies in income tax, declared value excess profits, and excess profits, taxes for the fiscal years ended September 30, 1941, through 1944, and assessing a penalty. By order of the court they have been consolidated for the purpose of the record and their submission here.

Taxpayer's petition to revew the adverse decision of Judge Leech in Cause No. 3455 presents the single question: Whether, though the properties conveyed by each transferor were different and of different value, the transaction, in which in 1936, L. W. Tilden, his wife, and eight children, acting together, transferred to taxpayer the citrus groves and farm land con-

stituting the enterprise known as the Tilden Properties, in return for which each grantor received one-tenth of the stock of taxpayer, satisfied the requirements of Sec. 112(b)(5) of Revenue Act of 1936, 26 U.S.C.A. that the amount of stock received by each transferor must be "substantially in proportion to his interest in the property prior to the exchange", and was therefore a nontaxable exchange so that the cost to the taxpayer of said property for depreciation, etc. was the cost thereof to the transferors.

While one hundred pages of the printed record are taken up with the statement of the evidence on this issue, and the findings of fact and opinion[1] take twenty-three more, the controlling, the ultimate, facts[2] are not in dispute and are such, we think, as to leave in no doubt that the answer to the question must be in the affirmative.

Because this is so, and because we are in complete agreement with the decision of the Tax Court on this issue, not only as to the result, but as to the reasons it gives, we shall say so without more except to say that the taxpayer's contention to the contrary is in law a sticking in the bark, an exaltation of form over substance, and, in fact, a denial of the effect of the plain and undisputed facts.

Taxpayer's petition for review of the adverse decision of Judge Johnson, in Cause No. 20082, presents two questions. The first and principal question is whether the Tax Court erred in approving the commissioner's determination that the net income of the Tilden joint venture for the fiscal years ended September 30, 1943, and September 30, 1944, was taxable to the petitioner. The second and subordinate question is whether, if this determination was correct, it erred in approving the commissioner's assessment of penalty.

The memorandum containing the findings of fact, which, in great detail and through twenty-five printed pages, sets out the undisputed facts and the opinion of the Tax Court, is not officially reported. Because it is not, because the facts came in without dispute, and because the determination of the judge turned on the legal effect of the facts, it will be necessary for us to state the controlling facts as they are set down in the judge's findings.[3]

---

1. 12 T.C. 507.

2. These facts are:

That no matter what form the papers, executed in connection with the L. D. Tilden operations, took before, upon the demand of the creditors, they were merged into the taxpayer corporation, the properties were in substance at all times owned and held in equal interests in exact accordance with the purpose and intent of Tilden and his family. This is shown in the statement attached to each of the loan applications submitted to the Land Bank in January, 1934, by Tilden and wife and their eight adult children, and the stock in the corporation was distributed 1/10th to each to carry out ·that intent and purpose and to satisfy the equal ownerships.

This statement declared of the conveyances Tilden had made that they had been made for the purpose of equitably distributing Tilden's estate at that time rather than by will, and that the tracts which Tilden retained would be devised or deeded to his minor daughter at maturity.

3. These, as pertinent here, are:

In 1936 Luther ·W. Tilden, Sr. was heavily indebted to the Exchange National Bank of Tampa, Florida, the Armour Fertilizer Works of Jacksonville, Florida, and several other creditors, and the petitioner was organized pursuant to a plan to refinance this indebtedness. In accordance with this plan the petitioner, shortly after its organization, assumed Tilden's debts in the approximate amount of $292,000, and with additional funds borrowed from the Exchange National Bank it compromised and paid off the claims of all creditors except the Bank and Armour Fertilizer Works. The refinancing was completed on or about December 5, 1936, and as a result the assumed indebtedness then consisted of notes secured by mortgages as follows:

| | |
|---|---|
| Mortgage payable—Exchange National Bank | $ 50,232.36 |
| Mortgage payable—Exchange National Bank | 70,000.00 |
| Mortgage payable—Exchange National Bank | 22,000.00 |
| Mortgage payable—Armour Fertilizer Works | 118,971.93 |
| Total | $261,204.29 |

From 1936 until his death in 1941 Luther W. Tilden, Sr. served as the petitioner's president and was in active charge of all its operations, and during

When it comes to his conclusions, we find ourselves in complete agreement with his statement that: "The burden of proving that the stockholders of petitioner entered into the lease-joint venture arrangement with the intention of joining together for the purpose of carrying on the citrus-grove business as a joint venture and shar-

that time its mortgage indebtedness was reduced to $180,783.75.

After his father's death in 1941, L. W. Tilden, II, (sometimes called Billy Tilden) became general manager for the petitioner and was thereafter in charge of its operations.

In Florida the citrus crop harvest begins in October and ends in June or July of the following year. The crop years 1940–1941 and 1941–1942 were generally good for Florida citrus growers, and on August 19, 1942, L. W. Tilden, II, wrote Armour Fertilizer Works, one of the petitioner's mortgage creditors, stating that petitioner had had a very successful year, both on production and sales, that it was faced with a very serious tax problem, and that they were trying to work out a solution of this problem.

*R. C. Pribble, a public accountant in Orlando, Florida, was employed by the petitioner in 1941 to do its accounting and prepare and file its tax returns. In the summer of 1942 a controversy existed between the petitioner and representatives of the Commissioner of Internal Revenue about the basis of its depreciable assets. This controversy hinged upon whether or not the 1936 exchange of petitioner's stock for various properties was a taxable or a nontaxable transaction. If the exchange was nontaxable as representatives of the Commissioner of Internal Revenue contended, the petitioner's basis for its depreciable assets was approximately $60,000. Faced with the possibility of this basis and petitioner's low equity invested capital for excess profits tax, Pribble became concerned about the effect of the excess profits tax upon petitioner's income. He estimated that after payment of excess profits taxes there would only be about ten per cent of petitioner's income available for payment of its mortgage indebtedness and that petitioner could not meet its obligations under the mortgages with such a small percentage of its income. He devised a plan whereby the individual members of the Tilden family would lease from petitioner its properties and operate them as a joint venture. Under date of August 25, 1942, he wrote identical letters to the two mortgage creditors asking for their approval of the plan. The substance of the plan was set forth in these letters as follows:*

"In connection with high income and excess profits tax on corporations it has been suggested that the Corporation lease lands, buildings, groves and equipment to a Joint Venture composed of all members of the Tilden family. This lease would be drawn providing for annual rental in an amount sufficient to cover interest, taxes and depreciation and there would therefore be no taxable income to the Corporation. Lands thus leased to the Joint Venture would be operated by the Joint Venture and all profits would accrue to members of the Joint Venture, Income Taxes being paid by these members, so that there would never be any excess profits tax.

"At a meeting held on September 21, 1942, a proposed lease of all petitioner's personal and real property was submitted to its board of directors and a motion was adopted directing its officers to execute the lease and take necessary steps to put the transaction in effect. * * *"

*The lease was executed by petitioner, as Lessor, and L. W. Tilden, II, as Lessee, at a rental of $30,000 per year, which was a fair rental. The lessee agreed to manage, cultivate, fertilize, irrigate, prune and care for all citrus trees, at his own cost and expense, to furnish all labor necessary for the operation, irrigation, care and cultivation of the groves, and to care for and maintain all live stock.*

The joint venture was formed as planned with the interest of each joint venturer being set out in the agreement. On the Tilden Joint Venture books the 1942–1943 and the 1943–1944 profits were allocated between the various members of the joint venture.

The members of the Tilden Joint Venture filed individual income tax returns for the calendar years 1943 and 1944 upon which each disclosed his or her share of the joint venture profits as allocated on the joint venture books. The Tilden Joint Venture paid the tax due on these returns, and the individual members of the joint venture subsequently refunded to the joint venture that portion of the tax which was due on their income from sources other than the joint venture. Except for the funds used to pay the income tax of the individual members of the joint venture on their respective shares of the 1942–43 and 1943–1944 joint venture profits, no part of these

ing in its profits and losses was on the petitioner."

■ We are, however, in complete disagreement with, and find clearly erroneous, his conclusion that they did not carry that burden, and, therefore, in complete disagreement with his conclusion, stated as a finding of fact, that: "The persons listed in the joint venture agreement did not really and truly intend to join together during the taxable years for the purpose of engaging in the business of operating the Tilden citrus groves as a joint venture for profit."

We are in complete agreement with the statement in the opinion: "Looking at the language of the joint venture agreement alone, its purpose was to create a separate and independent enterprise to operate the citrus groves for a period of five years as a joint venture and its profits were to be distributed to its members. If this language expressed the true intent of the parties, the joint venture was to be operated for the benefit of its members and not for the benefit of petitioner."

We are in disagreement with, and find clearly erroneous, the conclusion, "However, the conduct of the parties in executing its provisions convinces their intention was otherwise."

We are in agreement with the statement: "This and other Courts have repeatedly given recognition to the principle that a taxpayer has the right to reduce its taxes by any legal means and is not required to operate a business in the form most advantageous to the government tax-wise. It follows that the petitioner and its stockholders had the right to change the manner of operating its groves. But any change must have a business and not merely a tax-saving purpose, and the fact that a family-

profits has ever been distributed to any members of the joint venture.

On or about July 1, 1944, the Tilden Joint Venture purchased the petitioner's notes and mortgages from the Exchange National Bank and Armour Fertilizer Works. The three mortgages were assigned by the bank and Armour Fertilizer Works to the Joint Venture and they indorsed the notes to the joint venture "without recourse".

The accountant who audited the books of petitioner and the joint venture and prepared their income tax returns advised the members of the joint venture that the balance in their accounts on September 30, 1944, should not be distributed because of pending tax litigation. At the time the 1944 returns were filed the validity of the lease-joint venture arrangement had not been questioned by representatives of the Commissioner of Internal Revenue.

On or about Jan. 1, 1945, the lease between the petitioner and L. W. Tilden, II, was canceled. Immediately thereafter, by a deed dated Jan. 5, 1945, the petitioner conveyed its real estate and citrus groves, together with all agricultural crops, fruit on trees, buildings, farm machinery and equipment, irrigation equipment, autos, trucks, trailers, office equipment, insurance policies or other personal property located on the premises, to each of its stockholders, one-tenth to each.

The distribution made by the petitioner on Jan. 5, 1945, was recorded by appro-priate entries on its books of account, and it is referred to on the books as a distribution in liquidation. On their individual income tax returns for the calendar year 1945 each of the petitioner's stockholders reported a gain from the "liquidation of L. W. Tilden, Inc."

The Tilden Joint Venture was not liquidated and did not dissolve when the lease between the petitioner and L. W. Tilden II, was canceled on or about January 1, 1945. It was still in existence at the time this case was heard on April 8–9, 1949.

On or about Jan. 5, 1945, a new joint venture, known as "L. W. Tilden Groves", was formed orally by the ten members of the Tilden family who were the petitioner's stockholders and participants in the old "Tilden Joint Venture". To this new joint venture the individual members of the Tilden family contributed as capital their undivided interests in the assets distributed to them on the same date by the petitioner.

On various dates during the fiscal years ending Sept. 30, 1944 and Sept. 30, 1945, the Tilden Joint Venture paid obligations of the petitioner, and appropriate entries were made in this account to record the petitioner's liability arising from such payments.

In the notice of deficiency the respondent determined that the Tilden joint venture income for the years ended Sept. 30, 1943 and Sept. 30, 1944, was taxable to petitioner rather than to the individual members of the joint venture.

owned corporation and members of the family which own its stock are involved in the change requires that it be subjected to careful scrutiny to determine whether it is in fact what it appears to be in form."

We agree, too, with the statement: "Of course, if it appeared from the evidence that there was some likelihood that petitioner would lose its property and that the lease-joint venture arrangement provided for the receipt by petitioner of a greater income, after taxes, than it would have received if the lease had not been made, the reason given would have substance."

We are, however, in disagreement with, and find clearly erroneous, the view there expressed that since the only amount to be received by the petitioner was the rental and, under the terms of the joint venture agreement all profits after expenses were to be distributed to its members, the arrangement could not have had the effect of providing for the receipt by petitioner of a greater income after taxes than it would have had if the arrangement had not been made. We think this completely disregards the facts as to the Tilden venture and the dominant purpose which has sustained the Tildens from the beginning, to free the properties from debt and save them for the family.

Finally, we are in agreement with the statement: "After a careful consideration of all of the evidence submitted in this proceeding, we are convinced that the sole purpose of the members of the Tilden family and stockholders of petitioner in creating the lease-joint venture arrangement was to avoid the payment of excess profits taxes by petitioner and apply the tax savings thus realized to the payment of its mortgage indebtedness."

We are in complete disagreement with, and find clearly erroneous, the conclusion that what the parties did to realize this result was not a reality but a sham. We are of the clear opinion, in short that everything which was done by the Tildens in connection with the forming of the first and second joint ventures and the discharging of the debts, was in complete accord with, and carried out, the prime and unceasing purpose and intention which had dominated

the Tilden operations from the beginning, to discharge the heavy indebtedness which had accumulated against the Tilden properties and to save them for their real owners, the members of the Tilden family.

*From this point of view every action, which this long record shows the Tildens have taken since Tilden, Sr. first began his long uphill fight to save the properties, is seen in its true meaning, derives its true force.* The actions, particularly Tilden's deeding the properties to his wife and children to borrow money, and then causing the corporation to be formed and the properties to be deeded to it, which give rise, and furnish the answer, to the first question, whether when the corporation was formed a new base was acquired, all were taken with this end in view.

In the same way, the things done which give rise, and furnish the answer, to the second question must all be related to, and looked at from, this point of view. So viewed, we think it clear beyond question that it must be found and held: that, when it became clear to the Tildens that to continue to operate the properties under the corporate form into which they had been temporarily cast, in order to pay the debts and save them for their owners, would defeat the very purpose behind the assumption of this form, and they formed the venture, their actions in doing so had substance. Indeed, we think they were of the very essence of the general, the underlying, purpose which had animated the Tildens from the beginning of their troubles.

In this view, to say of these arrangements that they were not of the substance, but mere shadow, is to deny what was done, to turn reality into illusion. Indeed, it is a complete denial of the realities, a stubborn refusal to face the facts which show without dispute: that, since the formation of the first venture, the corporation has not operated the properties, but they have been operated either by the first or second joint venture; that under these arrangements taxes have been returned and paid for years, the mortgages have been paid off, and the property has been saved.

In the family partnership cases, of which we have written many, one of the most

recent being Batman v. Commissioner, 5 Cir., 189 F.2d 107, supporting the point by reference to, and discussion of, authorities, we have carefully pointed out that family arrangements which have substance are just as effective as those made by persons not members of the family. We have pointed out, too, that what is condemned in these arrangements is not the fact that they were made by families, but that there was the creation of a partnership form without any legal and effective change in the way and manner in which the business had been carried on.

Here there was a complete change, the return of the operations to the family form which had been departed from only to satisfy their creditors. The stockholders here actually took over the operation of the property, and it was never returned to the corporation. They received large profits from those operations, they have paid large taxes thereon, and when, with the moneys received, they had bought up the mortgages and later decided to dissolve their venture, they did not return the operation to the corporation. They formed a new venture arrangement and the corporation continues to exist only because of the pendency of this tax claim.

We think it is the commissioner, not the taxpayer, who puts form above substance when he insists that these transactions fail simply because the Tildens took the course they did to, and they did, save large taxes and with these savings were able to protect the property from the mortgages.

Our case, Armston & Co. v. Commissioner, 5 Cir., 188 F.2d 531, is not at all in point. The principles there decided are the same principles earlier discussed and given effect to by this court in Commissioner v. Greenspun, 5 Cir., 156 F.2d 917. Those cases merely refused to give effect to a form. They did not hold under facts comparable to these that substance would be denied to a transaction merely because it affected a large tax saving.

A case in point, though on facts not as strong for the taxpayer as here is Twin Oaks Co. v. Commissioner, 9 Cir., 183 F.2d 385. There, as here, a single judge Tax Court, the same judge sitting as sat here, denied substance to a real transaction, and the court reversed.

In view of our conclusion, that the decision of the Tax Court on the second question was wrong, it becomes unnecessary to determine the third question, whether, as found by the Tax Court, taxpayer was subject to a penalty.

The judgment in Cause No. 3455 is affirmed; in Cause No. 20082, it is reversed.