THE T. V. D. Co. (FORMERLY THE DUBOIS Co.), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 58804. Filed February 28, 1957.

*Harry B. Sutter, Esq., Peter L. Wentz, Esq., William P. Sutter, Esq.*, and *Edward Rothbart, Esq.*, for the petitioner.
*Lyman G. Friedman, Esq.*, for the respondent.

OPINION.

Tietjens, *Judge:* The facts as recited by counsel for the petitioner in his opening statement to the Court have been stipulated to be the facts. They are so found and are incorporated herein by this reference.

The petitioner, the T. V. D. Co., is an Ohio corporation having its principal office in Cincinnati, Ohio. It was originally known as the DuBois Co. The petitioner had, for a number of years prior to April 30, 1952, been engaged in the manufacture and sale of soap and other cleaning materials. At that time about 90 per cent of its stock was owned by members of the DuBois family.

Enterprise Productions, Inc., is a California corporation and, for some time prior to 1952, had been engaged in the production of motion pictures.

Bank of America National Trust and Savings Association, in the ordinary course of its banking business, lent substantial sums to Enterprise during its production of motion pictures. Bank of America also made substantial loans to subsidiary and affiliated companies of Enterprise, which loans were guaranteed by Enterprise.

As of December 31, 1950, Enterprise was indebted to the Bank of America in the sum of approximately $2,700,000 as principal and approximately $4,300,000 as guarantor. Enterprise defaulted on these obligations and the Bank of America foreclosed mortgages held by it upon motion pictures which were collateral for the loans. In addition, as a part of the proceedings initiated by the bank to effect collection of its debts, the Bank of America acquired all of the outstanding stock of Enterprise on June 20, 1951. Prior to that date, the Bank of America had no interest in Enterprise other than as a creditor.

On June 29, 1951, the Bank of America transferred all of the Enterprise stock to Sunset Securities Co. for the sum of $50, taking back at the same time an irrevocable option to reacquire the shares for $50. This was a technical transfer of legal title and was done for the purpose of meeting certain bank laws. Bank of America remained the beneficial owner of the stock of Enterprise.

Bank of America, in an effort to recoup the moneys which it had lent to Enterprise and its subsidiary and affiliated companies and which had become worthless debts, sought to acquire on behalf of Enterprise, a well managed and successful business which might be transferred into Enterprise. A Chicago attorney was retained by the bank to help locate the desired type of company. A blind advertisement was inserted in the Wall Street Journal and it was this advertisement which ultimately led to the acquisition by Enterprise of all of the petitioner's stock.

Prior to 1952 the petitioner's stockholders had been seeking a purchaser for their stock and had engaged a New York broker in this connection. He answered the blind advertisement in the Wall Street Journal and in due course Enterprise purchased all of petitioner's stock. Prior to the answering of the blind advertisement no person representing Enterprise or the Bank of America had ever met anyone representing petitioner or any of its stockholders. Further, prior to consummation of the transaction, no stockholder of petitioner had any interest in Enterprise or in the Bank of America and neither Enterprise nor the Bank of America had any interest in the petitioner.

By contract dated April 28, 1952, the holders of all of the issued and outstanding stock of petitioner agreed to sell all of such stock to Enterprise, at a price of $266 per share, or an aggregate of $6,977,712, to be paid as follows:

|  | Per share | Aggregate |
|---|---|---|
| Cash | $41.50 | $1,088,628 |
| 5 per cent notes of Enterprise, payable on or before Feb. 28, 1955 | 113.50 | 2,977,332 |
| 2 per cent notes of Enterprise, payable on or before Apr. 30, 1962 | 111.00 | 2,911,752 |
|  | $266.00 | $6,977,712 |

At the same time Enterprise entered into a credit agreement with the Bank of America under which the bank loaned to it $1,100,000 of new money which was used by Enterprise to make the initial cash payment required by the April 28 contract. The credit agreement required that Enterprise use the additional loan of $1,100,000 for the initial cash payment for the stock and also that as soon as possible the petitioner would be liquidated and the latter's business, assets, name, patents, trade-marks, and all operating assets would be taken directly into Enterprise.

The sale of petitioner's stock to Enterprise was consummated on April 30, 1952. Thereafter, no former stockholder of petitioner had any interest in Enterprise or in the Bank of America, other than as a creditor or an employee of Enterprise. Also, on April 30, 1952, Enterprise adopted a plan of liquidation of petitioner. The plan provided for the conveyance, transfer, and delivery to Enterprise, at the close of business on April 30, 1952, of all of the petitioner's properties, except Treasury Savings Notes, Series D, 90-day United States Treasury Bills, and sufficient cash estimated to pay all of the petitioner's liabilities. The plan also provided for the change of petitioner's name from The DuBois Co. to The T. V. D. Co. and for the reduction of its authorized capital stock to 500 shares, par value $50 each, or an aggregate of $25,000. The plan further provided for the complete cessation of business by petitioner at the close of business on April 30, 1952, and provided that thereafter the petitioner should do nothing other than those things necessary to its orderly liquidation, collection of its assets, and the payment of its bills. According to the plan the final distribution of petitioner's assets and its dissolution were to be completed after January 1, 1956, but not later than April 1, 1956, and that at that time the petitioner's remaining assets were to be transferred to Enterprise in exchange for and in complete cancellation of the remaining 500 shares of stock, whereupon the petitioner should be dissolved.

In conformity with the plan, the petitioner's name was changed, its authorized capital was reduced, a general bill of sale was executed by petitioner to Enterprise, supported by more particular documents, and all of petitioner's assets, except those specified in the plan, were transferred and delivered to Enterprise. All documents connected with such transfer were duly recorded in the appropriate governmental offices.

DuBois and all of the personnel and staff of the petitioner took positions with Enterprise. They were elected Enterprise's officers and directors, and, in addition, two directors were nominated and elected to Enterprise's board of directors by the Bank of America.

Enterprise's charter was formally amended to encompass dealing with detergents, soaps, and like products and its name was changed

to The DuBois Co., Inc. (To avoid confusion we will continue to refer to the latter as Enterprise). Enterprise qualified to do business in all of the States in which petitioner was theretofore authorized to do business; it obtained the necessary State and municipal sales licenses; it qualified under Workmen's Compensation laws; and it commenced to operate the business formerly owned by the petitioner.

At the same time the petitioner withdrew from the various States in which it had been authorized to do business. Also all of the petitioner's patents, trade-marks, and trade names were formally transferred from petitioner to Enterprise on the records of the appropriate offices in Washington; and all other steps necessary to complete the transfer of petitioner's business to Enterprise were taken.

After April 30, 1952, the petitioner ceased to do business and had nothing further to do with any assets transferred by it to Enterprise. From and after May 1, 1952, all sales, processing, and manufacturing connected with the petitioner's former business were conducted by Enterprise in its own name (The DuBois Co., Inc.) and for its own account. There were no intercompany transactions between petitioner and Enterprise after April 30, 1952, other than those necessary to carry through the liquidation of petitioner pursuant to the plan of liquidation.

The petitioner filed its income and excess profits tax return for the year 1952 reflecting its manfacturing and selling operations up to and including April 30, 1952. A separate return was filed by Enterprise, under its new name, for the fiscal year ended February 28, 1953, which included the results of its operation of the business acquired from petitioner for the period May 1, 1952, through February 28, 1953. However, due to the loss carryover from its prior motion picture operations, the income from soap and detergent operations from and after May 1, 1952, was reduced to zero and no income or excess profits tax was paid thereon.

The Commissioner determined that the manufacturing and selling operations of the soap business acquired by Enterprise from the petitioner, for the period May 1 through December 31, 1952, resulted in net income of $1,496,688.32. This income was allocated to the petitioner and in the notice of deficiency this action was explained as follows:

It is held that the acquisition by Enterprise Productions, Inc., a hopelessly insolvent corporation formerly engaged in the production of motion pictures, of the stock of The Du Bois Company, a successful manufacturer of industrial soaps and cleansing products, and the transfer of only the operating assets of Du Bois to Enterprise, together with personnel, customers and the change in name of Enterprise to The Du Bois Company, Inc. served no business purpose but was for the purpose of securing the benefit of the deduction of the prior years' operating losses of Enterprise contrary to the Internal Revenue Code and the intent of Congress. Further, to prevent the common control of these corporations from

being used to reduce, avoid or escape taxes, income and expenses of the soap manufacturing operations in the net amount of $1,496,688.32 for the period from May 1, 1952 to December 31, 1952 have been allocated to you in accordance with the provisions of Section 45 and Section 22 (a) of the Internal Revenue Code.

The Commissioner makes use of all the familiar arguments to sustain his action—principally, "substance versus form," "no business purpose," "solely for securing a tax benefit," and the result is "contrary to the Internal Revenue Code and the intent of Congress." He refers in the deficiency notice to the authority conferred by sections 22 (a) and 45 of the Internal Revenue Code of 1939 and, on brief, throws in sections 15 (c) and 129 for good measure. We doubt that the latter sections can be injected at such a late date, see *Commissioner* v. *Chelsea Products*, 197 F. 2d 620 (C. A. 3) affirming 16 T. C. 840, but will consider the effect of those sections, nevertheless.

We have no quarrel with the legal principles relied on by the Commissioner, but, in our opinion, he has misapplied them in this case.

First, the basic facts must be kept in mind. Petitioner, up till April 30, 1952, was a profitable corporation engaged in the manufacture and sale of soaps and detergents. On that date all its stock was purchased by Enterprise under an arrangement pursuant to which petitioner's operating business assets were taken over by Enterprise. From that date on, petitioner did nothing but liquidate remaining assets to discharge liabilities. The business of manufacturing soap and related products and their sale, which had formerly been petitioner's business, was thenceforth carried on by Enterprise. This business was operated at a net profit of some $1,400,000 for the period April 30, 1952, to December 31, 1952. This income was not reported by the petitioner. It was reported by Enterprise in its return for the fiscal year ended February 28, 1953. However, because of loss carryovers which Enterprise had from its former motion picture business the soap profits floated away tax free. The Commissioner now attempts to rectify this situation by attributing and taxing the profits to the petitioner. What he will do in the case of Enterprise (now the DuBois Co., Inc.) is another matter and is not before us.

We do not think section 45 authorizes the Commissioner's action. In the first place that section, for our purpose, authorizes the Commissioner to allocate gross income among two or more businesses where such businesses are owned or controlled by the same interests, if he determines that such allocation is necessary to prevent evasion of taxes or clearly to reflect income of any of the businesses. The legislative history of that section indicates that its main purpose was to prevent evasion of taxes by the shifting of profits, the making of fictitious sales, and other methods frequently adopted for the purpose of "milking." S. Rept. No. 960, 70th Cong., 1st. Sess., p. 24, 1939–1 C. B. 426. None of these frowned-on devices is here involved. We

also point out that here the deficiency notice and the findings of fact indicate that it was not gross profits but a "net profit" or "net amount" of $1,496,688.32 which the Commissioner allocated to petitioner. The authority to do this is not granted by section 45. *Chelsea Products, Inc.*, 16 T. C. 840, affd. 197 F. 2d 620 (C. A. 3).

In the second place, the Commissioner's action in allocating the soap profits realized during the period in question to the petitioner entirely ignores the existence of Enterprise as a corporate entity. Enterprise was no sham. True, it had to the date it purchased petitioner's shares been unsuccessful, but the very purpose of acquiring petitioner's operating assets and business was to remedy that deficiency and to place Enterprise in position to realize future earnings which could be applied in reduction of its indebtedness to Bank of America. If a "business purpose" is needed to rescue petitioner from its present trouble this certainly would furnish valid motivation for entering into the transaction. Cf. *L. W. Tilden, Inc.* v. *Commissioner*, 192 F. 2d 704 (C. A. 5, 1951).

Commencing April 30, 1952, and subsequent thereto Enterprise itself carried on the soap business. It engaged in no intercompany transactions with petitioner related to that business. Undoubtedly petitioner's former name and goodwill were important factors in the success of Enterprise with the business. However, the business assets were acquired by Enterprise in an arm's-length transaction and though the Commissioner makes much of an alleged tax avoidance scheme involving the offsetting of soap business profits against previous motion picture losses, we find no evidence that any such scheme was the primary motive. The possibility of a tax advantage was there, of course, but it must be remembered that while Enterprise had available loss carryovers at the time it took over petitioner's business, it did not at that time or by virtue of that transaction take over any profits from petitioner or have any guarantee that the soap business would from then on produce profits which would result in any tax savings to anyone. In other words, Enterprise took over a business that had in the past been profitable. It did not take over any profits of that business already earned. And for all that appears of record, whether the business would continue profitable after the takeover was anybody's guess. In these circumstances section 45 has no application. See *Estate of Julius I. Byrne*, 16 T. C. 1234; *Palm Beach Aero Corporation*, 17 T. C. 1169. See also *Twin Oaks Co.* v. *Commissioner*, 183 F. 2d 385 (C. A. 5), where the authority to employ section 45 in a similar situation also was denied.

What we have said also disposes of the Commissioner's contention that the profits of the soap business from April 30, 1952, to December 31, 1952, are properly taxable to petitioner under section 22 (a). As

we see it, after April 30, 1952, petitioner had nothing to do with the soap business. It was operated by Enterprise, to which there had been a complete shift of the operating assets. Petitioner did nothing to earn the income in question and we perceive no reason for disregarding Enterprise as a separate entity and attributing income apparently earned by Enterprise to petitioner. *Polak's Frutal Works, Inc.*, 21 T. C. 953.

The Commissioner also relies upon sections 15 (c) and 129 to support his determination. This reliance is misplaced. Section 15 (c) prevents a transferee corporation, if it is controlled by the transferor corporation or its stockholders, from taking advantage of the $25,000 exemption from surtax granted by section 15 (b) or the $25,000 minimum excess profits credit granted under section 431, unless such transferee corporation can show by a clear preponderance of the evidence that the securing of such exemption or credit was not a major purpose of the transfer. We fail to see how this section bears on this case. The issue involved here has nothing to do with the surtax on corporations, and, further, the petitioner is a transferor corporation and not a transferee corporation.

Section 129 refers to the acquisition of control of one corporation by another or control of the properties of one corporation by another, where the principal purpose of such acquisition is to secure the benefit of a deduction, credit, or other allowance, which the acquiring corporation would not otherwise enjoy. It is manifest from the unambiguous terms of section 129 that it applies only to an acquiring corporation and does not apply to an acquired corporation. *Commodores Point Terminal Corporation*, 11 T. C. 411 (1948). The petitioner here, of course, is an *acquired* corporation, and Enterprise is the acquiring corporation. When Enterprise took over petitioner's business, it did not acquire any deduction, credit, or other allowance, which it would not have otherwise enjoyed. Furthermore, as we have said above, Enterprise is not before us; and, so far as we can see, section 129 has no application in this case.

We hold that the Commissioner erred in allocating the income in question to petitioner.

*Decision will be entered under Rule 50.*