T.C. Memo. 2012-207

UNITED STATES TAX COURT

LOGENE L. FOSTER AND AGNES M. FOSTER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3576-10.                    Filed July 23, 2012.

<u>Kenneth Alan Love</u>, for petitioners.

<u>Benjamin J. Peeler</u> and <u>Lewis A. Booth</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  Respondent determined deficiencies in the Federal income

tax of Logene L. Foster (petitioner) and Agnes M. Foster and penalties as follows:

|       |            | Penalty      |
| Year  | Deficiency | Sec. 6662(a) |
|-------|------------|--------------|
| 2004  | $32,061    | $6,412.20    |
| 2005  | 24,865     | 4,973.00     |
| 2006  | 22,383     | 4,476.60     |

By amended answer, respondent asserts increased deficiencies as follows:

|       |            | Penalty      |
| Year  | Deficiency | Sec. 6662(a) |
|-------|------------|--------------|
| 2004  | $53,240    | $10,648.00   |
| 2005  | 43,772     | 8,754.40     |
| 2006  | 41,123     | 8,224.60     |

The issues for decision are: (1) whether petitioners engaged in a horse racing, training, and breeding activity (horse activity) with the objective of making a profit within the meaning of section 183; (2) whether petitioners are entitled to certain deductions pursuant to section 162 with respect to petitioner's law firm; and (3) whether petitioners are liable for accuracy-related penalties under section 6662(a). Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioners resided in Texas at the time the petition was filed.

Petitioner is a lawyer who has profitably headed his own firm, the Foster Law Firm, for more than three decades. Since 1984 petitioners also have operated a horse racing, training, and breeding activity, first as L&A Quarter Horses and later as L&A Racing (L&A). Petitioner Agnes Foster keeps the books for the law firm and the horse activity. Two of petitioners' sons, Lynn Foster and Lonnie Foster, are lawyers and work at petitioner's law firm. Another son, Lawrence Foster, is a professional horse trainer.

Petitioners' Horse Activity

When petitioner was growing up his family had horses, and from a young age he rode and trained horses. In 1984 one of petitioners' friends, who owned and raced quarter horses, convinced petitioners to buy a quarter horse from him to race. Shortly thereafter, petitioners sought business and tax advice from a certified public accountant with respect to pursuing their horse activity.

In 1984 petitioners also bought a home with approximately 12 acres of land and a barn for $375,000 to accommodate their horse activity. They made a number

of improvements to the property, including building stalls in the barn, adding fences, building an exercise track and a round pen for breaking and training horses, and installing a horse walker. Many of the improvements to their property to accommodate the horses were made by petitioners and their three sons. A 2010 appraisal, which included the residential portion of the property, indicated that this property had appreciated in value to $550,000.

Petitioners and their three sons attended races in which their horses ran, helped when their mares foaled; mucked stalls; and fed, galloped, walked, and bred the horses. Petitioners themselves spent more than 20 hours during the week and on weekends working with and caring for the horses. Two of their sons, Lonnie and Lawrence, learned to break and train horses and obtained their trainer's licenses. Petitioners eventually primarily employed Lawrence to care for and train their horses.

Through the years petitioners continued to buy and race quarter horses and consult with professional trainers and veterinarians regarding their horses. They bought some broodmares and began breeding horses, both for their own racing activity and to sell. Petitioners eventually began racing thoroughbred horses in addition to quarter horses.

Petitioners maintained a separate checking account for L&A and during the years in issue used QuickBooks software to track income and expenses. Beyond that, however, petitioners maintained few business records. Their business plan consisted of little more than generalized goals for the horse activity and a narrative account of significant events that occurred in the operation.

To reduce expenses, petitioners sometimes fed the horses mule feed instead of horse feed; performed some of their own veterinary work such as worming; had Lawrence, rather than a farrier, shoe the horses; and sold horses when the horses were no longer able to race. However, there were no records that substantiated the cost-reducing effects these measures had on the horse operation.

Petitioners experienced some setbacks with their horse activity. Some of their horses became ill, were injured, or died. Also, the State of Texas failed to pass much-hoped-for legislation allowing video gambling at the State's horseracing tracks, causing Texas horseracing purses to be less than those of surrounding States.

In 1996 petitioners' returns were audited by the Internal Revenue Service (IRS) in relation to the horse activity for 1992, 1993, and 1994. The IRS contended that petitioners were not engaged in the horse activity for profit within the meaning

of section 183. Petitioners requested review by the IRS Office of Appeals, and the IRS eventually conceded the section 183 issue.

By 2004 petitioners were considering ending the horse activity. The activity had sustained substantial losses every year of its operation and Lawrence, who by this time was training only for petitioners, was thinking about starting a hauling business. However, petitioners decided to try pinhooking horses because they knew of some people "who had done real good" with pinhooking. Pinhooking involves buying a young horse and training it to the point it can begin racing, then selling the horse to someone else who will actually race it. They began pinhooking around 2005 but also continued with their previously unprofitable activities of racing and breeding.

Although petitioners have reported losses for the horse activity every year from 1984 through 2009, they do not know the total amount of their losses because they did not retain records of losses for years before 2002. However, considering only years 2002 through 2009, petitioners' losses have been substantial:

| Year | Net loss from horse activity |
|------|------------------------------|
| 2002 | ($166,447) |
| 2003 | (118,486) |
| 2004 | (88,221) |
| 2005 | (79,108) |
| 2006 | (71,987) |
| 2007 | (76,213) |
| 2008 | (54,204) |
| 2009 | (69,078) |
| Total | (723,744) |

Petitioner's Law Firm

In contrast to the horse activity, petitioner's law firm has been profitable through the years. Until 2003 petitioners owned the building in which the law firm is located. In 2003 petitioners sold the building to the Foster Law Firm, P.C., an S corporation owned by petitioners' sons, Lynn and Lonnie, both of whom are lawyers who work as independent contractors for petitioner's law firm. Petitioner did not want to deal with tenants and maintenance of the building any longer, and his sons viewed the sale as a natural step in their father's transition to eventual retirement from practicing law. Lynn and Lonnie obtained bank financing for the purchase, and the bank required that they and petitioners personally guarantee the loan.

The law firm remained in the same building after the sale, and petitioners claimed deductions reported on the law firm's Schedules C, Profit or Loss From Business, for rent payments to their sons' S corporation in the following amounts for the years in issue: $30,000 for 2004, $24,500 for 2005, and $28,600 for 2006. Additionally, the law firm made payments of $3,155 (rounded to the nearest whole number) to the building's mortgage lender in 2005 which petitioners treated as lease payments, bringing the total payment amount for 2005 to $27,655. Petitioner's law firm and the S corporation had no written rent or lease agreement during the years in issue.

Petitioners also made payments from the law firm to their three sons during the years in issue. Payments of $98,074.52, $89,900.64, and $88,361.15 were made to Lonnie for contract legal services for 2004, 2005, and 2006, respectively. Lynn was paid $106,475.92, $108,591.84, and $102,931.08 for contract legal services for 2004, 2005, and 2006, respectively. Lawrence was paid $26,000, $25,500, and $22,000 for 2004, 2005, and 2006, respectively, for performing various tasks at the law firm. Petitioners did not claim deductions for these payments on their tax returns.

In addition to their substantial income from the law firm, petitioners receive other income, such as Social Security benefits and distributions from a Keogh

account. The following table shows petitioners' total income reported for 2002 through 2006:

| Year | Law firm income | Other income | Total income |
|------|-----------------|--------------|--------------|
| 2002 | $261,225 | $23,364 | $284,589 |
| 2003 | 213,587 | 23,902 | 237,489 |
| 2004 | 203,502 | 84,761 | 288,263 |
| 2005 | 161,340 | 60,173 | 221,513 |
| 2006 | 178,634 | 67,042 | 245,676 |

The IRS commenced an examination of petitioners' joint tax returns for 2004, 2005, and 2006. On November 12, 2009, respondent sent petitioners a notice of deficiency disallowing the loss deductions with respect to their horse activity. Petitioners filed a petition for redetermination with this Court on February 12, 2010.

In an amended answer to the petition filed on January 11, 2011, respondent asserted increased deficiencies and penalties based on allegations that the law firm's rent payments to petitioners' sons' S corporation should be disallowed and that petitioners underreported the income of the law firm on their Schedules C for the years in issue. Respondent alleged, and petitioners have conceded, that the amounts of unreported income for the law firm were $233,889 for 2004, $229,000 for 2005, and $217,898 for 2006. As an offset, however, the parties have agreed

that petitioners are entitled to additional deductions with respect to the law firm for amounts paid to Lynn and Lonnie for contract legal services for the years in issue.

OPINION

Horse Activity

Respondent determined that petitioners' horse activity was not an activity engaged in for profit within the meaning of section 183 and disallowed loss deductions they claimed on Schedule F, Profit or Loss From Farming, for the years in issue. Petitioners counter that they engaged in the horse activity with an intent to realize a profit.

Under section 183(a), if an activity is not engaged in for profit, no deduction attributable to that activity is allowed except to the extent provided by section 183(b). In relevant part, section 183(b) allows those deductions that would have been allowable had the activity been engaged in for profit only to the extent of gross income derived from the activity (reduced by deductions attributable to the activity that are allowable without regard to whether the activity was engaged in for profit).

Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year

under section 162 or under paragraph (1) or (2) of section 212." For expenses to be deductible under section 162, Trade or Business Expenses, or section 212, Expenses for Production of Income, and not subject to the limitations of section 183, taxpayers must show that they engaged in the activity with the primary objective of making a profit. Westbrook v. Commissioner, 68 F.3d 868, 875 (5th Cir. 1995), aff'g T.C. Memo. 1993-634.

Under section 183(d), in the case of an activity consisting in major part of the breeding, training, showing, or racing of horses, if the gross income derived from the activity exceeds the deductions for any two of seven consecutive taxable years, then the activity shall be presumed to be engaged in for profit, unless the Commissioner establishes to the contrary. See Golanty v. Commissioner, 72 T.C. 411, 425 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981). Petitioners have reported losses for L&A for every year from 1984 through 2009; therefore, the presumption does not apply in this case.

The expectation of a profit need not be reasonable, but the taxpayer must conduct the activity with the actual and honest objective of making a profit. Keanini v. Commissioner, 94 T.C. 41, 46 (1990). Greater weight is given to objective facts than to a taxpayer's self-serving statement of intent. King v. Commissioner, 116 T.C. 198, 205 (2001); sec. 1.183-2(a) and (b), Income Tax Regs. Evidence from

years subsequent to the years in issue is relevant to the extent it creates inferences regarding a taxpayer's requisite profit objective in earlier years. See Hoyle v. Commissioner, T.C. Memo. 1994-592; Smith v. Commissioner, T.C. Memo. 1993-140.

Generally, taxpayers bear the burden of proving that the requisite profit objective exists. Rule 142(a); Westbrook v. Commissioner, 68 F.3d at 876. The burden of proof may shift to the Commissioner if the taxpayers establish that they complied with the requirements of section 7491(a)(2)(A) and (B) to substantiate items, to maintain required records, and to cooperate fully with the Commissioner's reasonable requests. However, we decide this issue on the preponderance of the evidence and, therefore, the burden of proof is not relevant. See Estate of Black v. Commissioner, 133 T.C. 340, 359 (2009); Knudsen v. Commissioner, 131 T.C. 185, 189 (2008).

Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors to be weighed when considering whether a taxpayer is engaged in an activity for profit. These factors are: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in

carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, that are earned from the activity; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved in the activity. All facts and circumstances are to be taken into account, and no single factor or mathematical preponderance of factors is determinative. Westbrook v. Commissioner, 68 F.3d at 876. We address the most relevant factors in determining petitioners' intent objectively.

Carrying on the activity in a businesslike manner, such as by maintaining complete and accurate books and records, conducting the activity in a manner similar to other activities of the same nature which are profitable, and making changes in operations to adopt new techniques or abandon unprofitable methods are factors that may indicate a profit objective. Sec. 1.183-2(b)(1), Income Tax Regs. Businesslike conduct is characterized by careful and thorough investigation of the profitability of a proposed venture, monitoring of a venture in progress, and attention to problems that arise over time. See Ronnen v. Commissioner, 90 T.C. 74, 93 (1988); Taube v. Commissioner, 88 T.C. 464, 481-482 (1987).

Petitioners contend that they maintained complete and accurate books and records. However, other than income and expense statements prepared with

QuickBooks software and a "business plan" that included only generalized goals for the operation and a year-by-year narrative account of notable events occurring in the horse activity, petitioners produced virtually no business records. The business plan created by petitioners does not include budgets, economic forecasts or other analyses demonstrating financial management or planning of the activity and appears intended only to comply with regulations under section 183 in anticipation of tax benefits. Petitioners also did not retain any business records for years before 2002 and, consequently, are unable to determine with any accuracy the total losses they have incurred in the horse activity since its beginning in 1984.

The absence of accurate books and records does not conclusively establish the lack of a profit objective, see De Boer v. Commissioner, T.C. Memo. 1996-174, but there was scant evidence that petitioners used the few records that they did maintain for the important purposes of "cutting expenses, increasing profits, and evaluating the overall performance of the operation", see Golanty v. Commissioner, 72 T.C. at 430. They appear to have maintained income and expense statements in order to memorialize transactions for tax reporting purposes, rather than to analyze expenses or determine profitability. See Keating v. Commissioner, T.C. Memo. 2007-309, aff'd, 544 F.3d 900 (8th Cir. 2008); Dodge v. Commissioner, T.C. Memo. 1998-89, aff'd without published opinion, 188 F.3d 507 (6th Cir. 1999).

This conclusion is supported by petitioner's testimony that he "really wasn't keeping up [with] the losses particularly."

Petitioners' recordkeeping fell short of being businesslike in other respects that this Court has deemed important in determining whether taxpayers have the requisite profit objective. They did not produce separate records for each of their horses to demonstrate that they tracked breeding results and racing performance. See Dodge v. Commissioner, T.C. Memo. 1998-89. They also did not produce any records that showed that they reviewed each of their specific horse-related activities of quarter horse racing, thoroughbred racing, breeding, and pinhooking to assess which were more profitable. See Ballich v. Commissioner, T.C. Memo. 1978-497.

Perhaps the most important indication of whether an activity is being performed in a businesslike manner is whether the taxpayer implements methods for controlling losses, including efforts to reduce expenses and generate income. See Dodge v. Commissioner, T.C. Memo. 1998-89. Petitioners argue that they worked to reduce their expenses, including at times feeding the horses mule feed instead of horse feed; doing some of their own veterinary work; and having their trainer son Lawrence, rather than a farrier, shoe the horses. However, they provided no evidence regarding how much they reduced their expenses, if any, by implementing

these measures. See Dennis v. Commissioner, T.C. Memo. 2010-216 (the taxpayer demonstrated a profit objective with respect to reducing expenses where he provided calculations showing the cost-reducing effects of performing certain veterinary and horse care services himself).

Petitioners' failure to produce any significant income was a key factor in their failure to earn a profit. See Dodge v. Commissioner, T.C. Memo. 1998-89. Petitioners contend that they made changes in their operations over the years in an effort to increase their income. Those changes involved adding quarter horse breeding, thoroughbred racing, and pinhooking to their initial activity of quarter horse racing. There was little in the record, however, that established that these changes were implemented for the purpose of making the activity profitable rather than for other noneconomic reasons, and petitioners did not produce any evidence demonstrating that they made a careful and thorough investigation of the potential profitability of any of these changes before making them. See Taube v. Commissioner, 88 T.C. at 481.

Furthermore, specific activities that had proven unprofitable were not expeditiously abandoned. See Wesinger v. Commissioner, T.C. Memo. 1999-372 (the lack of a profit objective was indicated where the taxpayer failed to expeditiously abandon a business technique that had not been profitable). As of

2004, the first year in issue here, petitioners considered abandoning the horse activity altogether but instead continued with a new speculative venture. After petitioners began pinhooking, they still were racing and breeding horses, activities in which they had incurred substantial losses. In fact, during 2006 their racing expenses increased dramatically from immediately prior years. On balance, we are not persuaded that petitioners carried on their horse activity in a businesslike manner. This factor negates a profit objective.

The taxpayers' expertise, research, and study of an activity, as well as their consultation with experts, may be indicative of a profit motive. See sec. 1.183-2(b)(2), Income Tax Regs. Petitioners had extensive knowledge about horses and the horse industry, partly because of petitioner's years of breaking and training horses, but also from their continued study of bloodlines and breeding, training, and racing techniques. Furthermore, during the course of the horse activity, petitioners consulted with persons who were knowledgeable about horse racing, training, and breeding, including professional trainers and veterinarians. See Givens v. Commissioner, T.C. Memo. 1989-529 (a profit objective was indicated where the taxpayer sought and acquired advice in all aspects of Tennessee walking horse breeding from experienced owners, trainers, and a veterinarian). Petitioners also sought business and tax advice from an accountant when they began their horse

activity. In the face of mounting losses, it would have been prudent to seek further business advice; however, on balance we believe this factor slightly favors petitioners.

The taxpayers' devotion of much of their personal time and effort to carrying on an activity may indicate a profit motive, particularly if the activity does not involve substantial personal or recreational aspects. Sec. 1.183-2(b)(3), Income Tax Regs. Although both petitioners also were involved in working at the law firm, they spent more than 20 hours during the week and on weekends working in their horse activity, often performing manual and menial tasks such as feeding and walking the horses and mucking stalls. See Givens v. Commissioner, T.C. Memo. 1989-529 (the taxpayer demonstrated the requisite profit objective where he spent two to four hours daily and more time on weekends doing chores and maintenance in his horse activity). This factor favors petitioners.

An expectation that assets used in the activity will appreciate may indicate a profit motive even if the taxpayers derive no profit from current operations. Sec. 1.183-2(b)(4), Income Tax Regs. Petitioners argue that they expected the horses that they owned to appreciate because of successful racing and breeding. Petitioners provided no records for 2004, but computer printouts provided for 2005 and 2006 indicate that during those years petitioners sold a number of horses for

more than they had paid for them. The printouts, however, were not substantiated with receipts, bills of sale, or other records. Petitioners also contend that they expected the 12-acre property on which they conducted their horse activity to appreciate, and the 2010 appraisal indicated that the property had increased in value from $375,000 at the time of purchase to $550,000.

However, a profit objective may be inferred from such expected appreciation of the activity's assets only where the appreciation exceeds operating expenses and is sufficient to recoup the accumulated losses of prior years. See Golanty v. Commissioner, 72 T.C. at 427-428; Hillman v. Commissioner, T.C. Memo. 1999-255. The appreciation of petitioners' horse activity assets does not begin to approach the amounts of losses petitioners have reported since the beginning of their horse activity. Furthermore, the 12-acre property also is petitioners' principal residence, and much of its appreciation likely is attributable to the residential portion of the property rather than the portion used in the horse activity. This factor is neutral.

A history of continued losses with respect to the activity may indicate the lack of a profit motive. See sec. 1.183-2(b)(6), Income Tax Regs. While a series of losses during the initial or startup stage of an activity may not necessarily indicate a lack of a profit motive, a record of large losses over many years is persuasive

evidence that a taxpayer did not have such a motive. Golanty v. Commissioner, 72 T.C. at 426; Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), aff'd, 379 F.2d 252 (2d Cir. 1967). An activity's cumulative losses should not be of such a magnitude that an overall profit on the entire operation, including recoupment of past losses, could not possibly be achieved. Bessenyey v. Commissioner, 45 T.C. at 274. If losses are sustained because of unforeseen or fortuitous circumstances beyond the control of the taxpayer, such losses would not be an indication of the lack of a profit motive. See sec. 1.183-2(b)(6), Income Tax Regs.

Petitioners have realized no profits whatsoever in more than 25 years of engaging in their horse activity. They argue, however, that their losses are not an indication that they lack a profit objective because the losses have been caused by factors beyond their control. Those factors include injury, illness, and death of a number of their horses and the failure of legislation that would have allowed video lottery terminals (slot machines) at horseracing tracks in the State of Texas. We acknowledge that horseracing, breeding, and training are highly speculative activities, but these events hardly account for an unbroken string of more than 25 years of losses. Furthermore, petitioners did not show that their horse activity would have been profitable if events beyond their control had not occurred. See

Burger v. Commissioner, 809 F.2d 355, 360 n.8 (7th Cir. 1987), aff'g T.C. Memo. 1985-523.

Petitioners further contend that they could potentially earn a substantial profit with one outstanding horse. The possibility of a speculative profit in a taxpayer's horse activity, however, is insufficient to outweigh the absence of profits for a sustained period of years. See Chandler v. Commissioner, T.C. Memo. 2010-92 (the possibility of a speculative profit did not outweigh more than 20 years of losses reported for the taxpayer's horse activity); McKeever v. Commissioner, T.C. Memo. 2000-288 (11 consecutive years of horse activity losses failed to indicate that the taxpayer had a profit objective even though there was the possibility of a speculative profit). This factor strongly favors respondent.

Substantial income from sources other than the activity may indicate that the activity is not engaged in for profit. See sec. 1.183-2(b)(8), Income Tax Regs. This is particularly true if the losses from the activity generate substantial tax benefits. Golanty v. Commissioner, 72 T.C. at 429. A taxpayer with substantial income unrelated to the activity can more readily afford a hobby. See Wesley v. Commissioner, T.C. Memo. 2007-78. Petitioners' substantial income from the law firm and other sources has allowed them to continue their horse activity in spite of more than 25 years of losses, and the activity also has generated generous tax

savings in the form of net losses that offset that income. This factor favors respondent.

Finally, the presence of personal motives and recreational elements in carrying on an activity may indicate that the activity is not engaged in for profit. Sec. 1.183-2(b)(9), Income Tax Regs. Petitioners contend that the horse activity, particularly mucking stalls, was hard work rather than pleasure. We do not believe, however, that petitioners and their sons would have continued the losing horse activity for more than 25 years unless they received satisfaction from the work. It is more likely that such satisfaction, rather than a profit objective, accounts for their persistence. This factor does not favor petitioners but is neutral.

After weighing all the facts and circumstances in the light of the relevant factors, we conclude that petitioners did not engage in their horse activity for the years in issue with the requisite profit objective. The many years of losses without a meaningful plan for recouping them are most persuasive. Accordingly, we sustain respondent's disallowance of the loss deductions relating to the horse activity under section 183.

Law Firm Deductions Under Section 162

If the Commissioner raises new matters or asserts increased deficiencies in his answer to the taxpayers' petition, the Commissioner bears the burden of proof

on those issues. See Rule 142(a); Truesdell v. Commissioner, 89 T.C. 1280, 1292-1293 (1987). Respondent first raised the issues of the law firm's unreported income and the disallowance of petitioners' claimed deductions for the law firm's rent payments in his amended answer; therefore, respondent has the burden of proof on these issues.

Payments to Petitioners' Sons

Inasmuch as petitioners have conceded that they underreported the law firm's gross income for the years in issue, respondent has carried the burden of proof with respect to such income. Petitioners assert that the amounts of unreported income consisted of payments for services provided by their sons that petitioners subtracted from the law firm's gross income before reporting that income on their tax returns. Petitioners now argue that the unreported income should be offset by deductions for those payments not claimed on their tax returns. Respondent, however, seeks the increased deficiency only with respect to payments made to Lawrence; respondent does not dispute the deductibility of payments made to Lynn and Lonnie for contract legal services.

Section 162(a) allows a deduction for ordinary and necessary expenses paid or incurred by a taxpayer in carrying on any trade or business. In general, payments made or incurred by a trade or business for personal services rendered are ordinary

and necessary business expenses and may be deducted under section 162(a). The burden of showing entitlement to a claimed deduction is on the taxpayer. See Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Taxpayers must maintain records sufficient to substantiate the amounts and purposes of deductions claimed. See sec. 6001; Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976).

Petitioners have produced no records substantiating the work that Lawrence performed at the law firm. In the event a taxpayer establishes that he or she incurred a deductible expense but is unable to substantiate the precise amount, the Court may approximate the amount of the expense. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). The Court, however, must have sufficient evidence upon which to make a reasonable estimate to apply the Cohan rule. Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). Petitioners' evidence regarding the duties Lawrence performed for the law firm consisted only of generalized testimony that he transported boxes of documents for petitioner and drove petitioner to work. Petitioners provided no details establishing Lawrence's duties, how many hours he worked, or on what basis he was paid during the years at issue. Therefore, we have no reasonable basis for applying the Cohan rule, and we

conclude that petitioners are not entitled to any deductions for payments made from the law firm to their son Lawrence.

Rent Payments

The S corporation bought the office building in which the law firm is located from petitioners in 2003. Subsequently, the law firm made rent payments to the S corporation of $30,000 for 2004, $27,655 for 2005 (which included building mortgage payments made by petitioners and treated as rent payments), and $28,600 for 2006. Petitioners claimed deductions for these payments on their Schedules C for the law firm for the years in issue.

Respondent contends that the sale of the building was a tax-motivated transaction by which petitioners transferred an asset to their sons at less than fair market value, increased the depreciable basis of a building that had previously been fully depreciated, avoided recapture of depreciation, and allegedly entered into an oral lease but did not comply with the terms of the lease they describe. According to respondent, these factors indicate that the sale had no economic substance and thus petitioners' deductions for rent payments should be disallowed by the Court. Petitioners assert nontax reasons for the sale of the building and actual transfer of ownership.

Respondent further argues that "[i]n substance the petitioners have achieved a significant increase in the deductions against the Schedule C income of the [law firm], while passing a significant family owned asset to the next generation with * * * little or no tax consequence to the petitioners' sons."

A transaction may be disregarded as lacking in economic substance where there is no legitimate business purpose and the transaction is motivated only by a desire to minimize taxes. See W.H. Armston Co. v. Commissioner, 188 F.2d 531, 533 (5th Cir. 1951), aff'g 12 T.C. 539 (1949). Where there is a legitimate business purpose, however, the transaction will be recognized as having economic substance even though a tax-saving purpose is also present. See L.W. Tilden, Inc. v. Commissioner, 192 F.2d 704, 708-709 (5th Cir. 1951), rev'g a Memorandum Opinion of this Court dated March 16, 1950, 9 T.C.M. (CCH) 219 (1950).

Respondent relies on W.H. Armston Co. In that case a closely held corporation, a construction company whose majority owners were husband-and-wife stockholders, sold some heavy equipment to the stockholder wife who then leased the equipment back to the corporation. The Court of Appeals for the Fifth Circuit determined that the purported sale had no legitimate business purpose other than as a device for minimizing the corporation's tax liability as a result of deductions for the lease payments. The court consequently held that the lease

payments made to the wife were constructive dividends that were not deductible as ordinary and necessary business expenses by the corporation. In holding that the purported sale should be disregarded for tax purposes, the court noted that the wife was primarily a housewife with no independent income of her own who relied on the advice of her husband in anything she did relating to the corporation.

Here, unlike the stockholder wife in W.H. Armston Co., petitioners' sons, Lynn and Lonnie, have income of their own and were required to join petitioners in personally guaranteeing the loan used to purchase the building. Except for building payments of $3,155 made by petitioners that were treated as rent payments, the S corporation or petitioners' sons made the building's mortgage payments, and their sons also took out an additional loan to have improvements made to the building. Furthermore, the testimony at trial established that there was a legitimate business purpose for the sale of the building: Petitioner was tired of having to deal with tenants and maintenance of the building, and petitioners' sons, who were lawyers that worked at their father's law firm, viewed purchasing the building as a natural step in their father's transition to eventual retirement from his law practice.

Whether the sale of the building was at a less-than-arm's-length price, whether some of the deductions that petitioners have claimed in relation to the

building were properly deductible on the Schedules C of the law firm, and whether a fair market rent was being charged are issues that might bear more scrutiny. However, respondent has asserted only that the rent payments are not allowable because the transaction was purely tax motivated. Respondent has not persuaded us that the transaction lacked economic substance. Thus the rent deductions for payments actually made are not disallowed.

Section 6662(a) Accuracy-Related Penalties

Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty on any underpayment of Federal income tax attributable to a taxpayer's negligence or disregard of rules or regulations or substantial understatement of income tax. Section 6662(c) defines negligence as including any failure to make a reasonable attempt to comply with the provisions of the Code and defines disregard as any careless, reckless, or intentional disregard. Disregard of rules or regulations is careless if the taxpayer does not exercise reasonable diligence to determine the correctness of a tax return position that is contrary to the rule or regulation. Sec. 1.6662-3(b)(2), Income Tax Regs. An understatement of income tax is substantial if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A).

Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose penalties. Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Considering the substantial amounts of unreported income and the erroneous loss deductions that petitioners claimed for the years in issue, respondent has satisfied the burden of producing evidence that the penalties are appropriate.

Once the Commissioner has met the burden of production the taxpayer must come forward with persuasive evidence that the penalties are inappropriate because he or she acted with reasonable cause and in good faith. Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 447-448. The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners have not shown reasonable cause for claiming the erroneous loss deductions for their horse activity or underreporting the law firm's income with respect to amounts paid to their son Lawrence. As to the horse activity, petitioners rely solely on the fact that the IRS conceded the section 183 issue during their first audit for tax years 1992 through 1994.

A failure by the Commissioner to disallow similar deductions in a prior year's audit of a taxpayer's return may be a factor to be considered with respect to the imposition of the accuracy-related penalty. See Stewart v. Commissioner, T.C. Memo. 2002-199; Sheehy v. Commissioner, T.C. Memo. 1996-334. However, petitioners' first audit was conducted more than 10 years earlier when the horse activity arguably was still within its startup phase during which losses could be expected. In subsequent years, petitioners continued to sustain significant losses, but did not seek competent advice regarding whether they should have continued to treat their horse activity as being engaged in for profit. Petitioner's testimony indicated only that they talked with a certified public accountant and "a few people" at a time undisclosed in the record. Petitioners gave no details regarding what information they provided to the accountant or what the accountant's advice was. The accountant did not testify. As to petitioners' underreporting of the law firm's income with respect to amounts paid to their son Lawrence, they produced no evidence proving that they sought or relied upon competent advice in relation to the unjustified practice of omitting from gross receipts income distributed to their sons.

Petitioners' tax returns for the years in issue were prepared by a bookkeeping and tax service, not a certified public accountant, and petitioners gave no details

about the information they provided to their tax return preparer or whether their tax return preparer was competent to prepare their tax returns.  Therefore, we sustain the penalties on the recomputed and increased deficiencies with respect to the disallowed horse activity losses and the unreported law firm income related to payments made to petitioners' son Lawrence.

In reaching our conclusions, we have considered all arguments made by the parties and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered under Rule 155.